THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GARY W. MILLER, Defendant-Appellant.

Fifth District   No. 5—98—0434

Opinion filed February 15, 2000.

Daniel M. Kirwan and Paige Clark Strawn, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

James Creason, State's Attorney, of Salem (Norbert J. Goetten, Stephen E. Norris, and Sharee S. Langenstein, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HOPKINS delivered the opinion of the court:

Defendant appeals from his conviction of the offense of predatory criminal sexual assault of a child (720 ILCS 5/12—14.1(a)(1) (West 1996)). Defendant contends that his right to a fair trial was violated (1) when the trial judge read a transcript of the complaining witness's testimony to the jury during deliberations and (2) when the court admitted a highly prejudicial and irrelevant statement made by defendant. For reasons we will more fully explain, we reverse and remand.

## FACTS

On New Year's Day 1998, Tanya Harmon took her daughter, B.C., then six years old, to the emergency room of St. Mary's Hospital in Centralia, Illinois. The emergency room nurse, Judy Smith, testified at defendant's trial that she was on duty when B.C. and her mother arrived. B.C. told Judy that someone put his hand down her pants.

Judy examined B.C. and noticed redness in B.C.'s vaginal area but no trauma that exclusively indicated sexual abuse. Judy testified that redness could result from poor hygiene, insufficient wiping after urination, or someone rubbing the area.

While Tanya and B.C. were at the hospital, Officer James Ramsey, a Centralia police department patrolman, interviewed B.C. and Tanya. According to Ramsey, at first B.C. would not talk to him, but later B.C. said that she wished defendant would die because he hurt her by digging his fingers up into her. Ramsey testified that B.C. indicated where defendant hurt her by pointing to her vaginal area rather than by saying anything. After Ramsey questioned B.C. further, she indicated that defendant did this to her "under her clothes."

Prior to trial, in response to one of defendant's motions *in limine*, the trial court allowed the State to conduct an offer of proof outside the presence of the jury. Ramsey testified in the offer of proof that, after interviewing B.C., Ramsey arrested defendant, transported him to the police station, gave him his *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)), and told defendant that someone reported that defendant touched B.C. inappropriately. Ramsey described what defendant said when he asked defendant if he had touched B.C. inappropriately:

"His response was he was arrested in Maine when he was thirteen for gross sexual misconduct [and] that he had done a lot of bad things in the past."

Ramsey testified:

"[I wanted to] clarify exactly what[—]if he was answering my question or whether he was trying to lead with that. I asked him if he was talking about [B.C.] or if he meant he had been touching [B.C.] inappropriately, what he meant by that statement. At that point, he said [']I think I need to speak to a lawyer.[']"

Ramsey terminated the interview at that point.

Defendant's attorney asked Ramsey if defendant ever told him that he sexually assaulted B.C. Ramsey responded that defendant had not.

The trial court granted defendant's motion to bar evidence about defendant's arrest in Maine, since that occurred when defendant was a juvenile and is inadmissible under the Juvenile Court Act of 1987 (705 ILCS 405/1—10 (West 1996)). The State argued, however, that the portion of defendant's statement referring to doing a "lot of bad things" was admissible as a direct response to Ramsey's question about touching B.C. inappropriately. The State argued that the statement was admissible because it was just as likely that defendant was admitting to the charge against him as it was that he was referring to

his juvenile problems. The State argued that any interpretation of the statement or the determination of what weight to give it should be made by the jury.

Defendant argued that the statement was inadmissible because defendant could not clarify it without divulging his juvenile conviction.

The trial court denied defendant's motion *in limine* to keep the statement out. The trial court found that the statement was "a specific response to a direct question."

Prior to the trial, the State filed a motion to allow the complaining witness, B.C., to testify via closed circuit television, based upon a letter from her therapist, Jean Nosbisch, to the Marion County State's Attorney. In the letter, Nosbisch stated that B.C. should be allowed to testify via closed circuit television because it was "necessary to prevent any further trauma to the six-year-old child," in that she was fearful of defendant and was having nightmares and "other symptoms of Post Traumatic Stress Syndrome [*sic*]." Defendant objected to the motion on the ground that it violated his sixth amendment right to confront the witnesses against him. The trial court granted the State's motion.

The State called B.C. as its first witness. In the courtroom, without the jury present, defendant's attorney informed the court that, "for strategy reasons," defendant requested not to be present in the courtroom while the jury viewed and listened to B.C.'s televised testimony. The record indicates that defendant waited in the law library, but it is not clear if defendant had a television available for viewing B.C.'s testimony.

When B.C. testified, the trial judge, the State's Attorney, defendant's attorney, the court reporter, B.C., and her mother were all present in one courtroom and the jury was in another courtroom watching B.C. on the television. B.C.'s testimony began as follows:

> "THE COURT: [B.C.], I need to ask you a few questions. First of all, you remember last week we talked about telling the truth? Remember that?
>
> B.C.: Yes.
>
> THE COURT: And you know the difference between the truth and a lie? Correct?
>
> B.C.: (The witness nodded her head.)"

At this point, the circuit clerk apparently came into the room where B.C. was testifying and commented that the "camera went static." There is nothing in the record to indicate whether the circuit clerk came from the courtroom in which the jury was watching B.C.'s testimony, there is nothing to indicate exactly what the clerk meant by "static," and there is nothing to indicate what anyone did to correct

the problem. The trial judge responded by saying, "Thank you," and resumed questioning B.C.

"THE COURT: Okay, [B.C.], you remember last week, last Friday, and I talked to you a few minutes, and you are going to have to speak loud enough so that Officer Ramsey can hear you. Could you do that?

B.C.: Yes.

THE COURT: You remember you told me you would tell the truth?

B.C.: Yes.

THE COURT: And you remember we talked about the difference between the truth and a lie. Remember?

***

THE COURT: *** You told me you would tell the truth.

B.C.: Yeah.

THE COURT: And you will do that today, too, okay? Okay, I am going to let these attorneys ask you a couple of questions?

B.C.: (The witness nodded her head.)"

After the judge's questions, the State began questioning B.C. B.C. testified that defendant gave her a "bad touch," which meant, she said, that he touched her in a private place. The trial court interrupted the State's questioning to inform the State's Attorney that "the picture went off again." When the State resumed questioning, B.C. testified that the "bad touch" occurred in the bathroom of the house where she used to live. B.C. testified that defendant touched her with his fingers under her clothes. When asked what defendant did with his fingers, she stated, "He dug them up inside me." B.C. testified that when she told defendant to stop, he stopped, but that he told her not to tell anyone. B.C. testified that she told her mother about what happened after her stepbrother, Joe, told her mother about it.

Under cross-examination, B.C. testified that when defendant did these things, he was babysitting her. She admitted that defendant babysat for her in the past and that sometimes he made her clean her room or the house, which made her mad. She admitted that she and defendant went into the bathroom together to pick out snacks that were kept in a pantry in the bathroom. She admitted that as they were choosing the snacks, she told defendant "no" more than once, in response to his questions if she wanted certain snack items. B.C. testified that she was crying when she was in the bathroom, but not when she came out.

Joe Miller, B.C.'s stepbrother, who was 11 years old at the time of the trial, testified that he lived with his father, B.C., B.C.'s mother, and defendant on New Year's Eve 1997. That evening, B.C.'s mother and Joe's father went over to a friend's house and left defendant with

Joe and B.C. Joe testified that after the parents left, defendant told B.C. to put on her nightgown, and defendant and B.C. both went into the bathroom to get snacks. Joe testified that after 20 or 30 minutes, B.C. and defendant came out of the bathroom. While they were in the bathroom, Joe was in the kitchen about four feet away from the closed bathroom door. Joe described what he heard coming from behind the closed door:

> "[B.C.] like a scared cry saying, stop, don't do that, and, stop, Gary, no, and repeatedly."

Joe testified that he did not hear defendant talking, but he heard pants unzipping. According to Joe, when they came out of the bathroom, they brought snacks with them. Joe testified, "[B.C.] had red under her eyes, and they were a little wet."

Joe testified that either later that night or the next day, he told B.C.'s mother about what happened.

B.C.'s mother, Tanya, testified that on January 1, 1998, after Joe talked to her, she took B.C. to the hospital. Tanya's testimony corroborated Ramsey's regarding the statements B.C. made to Ramsey.

Officer Ramsey testified at trial essentially the same as in his offer of proof. Ramsey testified that, after he arrested defendant, Ramsey explained defendant's *Miranda* rights and defendant signed the form indicating that he understood those rights. Ramsey's testimony was as follows:

> "[THE WITNESS:] [I told defendant I] would listen if he was willing to give a statement. I asked him if he had touched [B.C.] in a manner that would be deemed inappropriate by [B.C.] or her parents.
>
> THE STATE: And did he respond to that question by stating, I have done a lot of bad things?
>
> A. Yes, sir, he did."

On cross-examination, Ramsey admitted that defendant did not tell him that he sexually assaulted B.C. and that the police did not attempt to gather any physical evidence from defendant.

Terry Knolhoff testified that he was in the same cellblock with defendant after his arrest. Knolhoff testified that defendant told him that defendant was charged with sexual assault but that the State did not have a case against him, because the doctor who examined the child did not find any evidence of a crime. Knolhoff testified that defendant told him that he gave the boy (Joe) a cigarette to leave defendant and B.C. alone in the bathroom, and then defendant started "fingering the little girl" until the boy came back and he had to stop. Knolhoff admitted that he had been convicted of burglary twice before, that he was in jail at the same time as defendant on a charge of forgery,

and that he was released on bond for the forgery charge in exchange for his testimony against defendant.

Dr. Mohammed Ashgar, the physician who examined B.C. at the emergency room, testified that his physical examination revealed no injuries to B.C. consistent with sexual abuse but that it was possible for an adult to digitally penetrate a child's vaginal area without damaging the hymen or causing other types of injury.

Defendant testified that on New Year's Eve 1997, he was living with his uncle, his nephew Joe, his uncle's girlfriend (Tanya), and B.C. When the parents went out for the evening, he stayed home with the children. He testified that he told B.C. to put on her nightgown, and after she did, they went into the bathroom to the pantry to get some snacks. Defendant testified that he was in the bathroom for only about a minute and a half and that B.C. said "no" a few times when asked if she wanted certain snack items. Defendant testified that he babysat for Joe and B.C. again the next day, and when he asked B.C. to clean her room, she became very angry at defendant.

Defendant admitted he told Ramsey that he had done a lot of bad things but denied he told Ramsey or Knolhoff that he sexually assaulted B.C. Defendant explained that he made the statement to Ramsey, about having done "bad things," in reference to prior arrests. Defendant asserted that he told Ramsey that he did not touch B.C. and that then he asked for a lawyer. Defendant denied that he sexually assaulted B.C. and stated that B.C. was fabricating the story, but he did not know why.

The State called Officer Ramsey in rebuttal. Ramsey denied that defendant ever told him that he did not molest B.C. Ramsey claimed that defendant never stated whether he did or did not molest her.

The jury retired to deliberate at 10:35 a.m. At approximately 10:50 a.m., the jury sent out the following note:

> "The T.V. kept going out during [B.C.]'s testimony. There were parts of her testimony we did not see. Did the tape pick up all the testimony[,] and if so[,] can we review the tape?"

The judge met in chambers with defendant's attorney and the State's Attorney, but there is no indication that defendant was present during this meeting. The judge stated that he and the attorneys "agreed" to the following response:

> "When the video camera failed, we stopped the questions of [B.C.] and only began again after it was back on. To the best of our knowledge, we picked up where we left off, and there should be no gaps in what you heard from what she testified to."

The trial judge signed the response and returned it to the jury.

Sometime before 4 p.m., the jury sent out a second note, which stated:

"Your Honor

There is great concern over the testimony of [B.C.]. The jury feels the [sic] need a copy of [B.C.]'s testimony because of [the] poor quality of the video we watched during the hearing. Without the transcript I'm afraid we may not be able to come to a decision."

The judge sent the jury a written response, which stated:

"The reason for the delay is that the court reporter is preparing the transcript of [B.C.]'s testimony."

The response was signed by the trial judge.

At approximately 4 p.m., the jury was brought back into the courtroom, and the trial judge told the jury as follows:

"I do wish to indicate to you that, in addition to the preparation of the transcript, certain matters were discussed by the Court with counsel regarding this. The procedure that we have agreed upon or that I have made the decision on is that I am going to read the transcript to you."

The trial court did not poll the jurors to find out what they did or did not see or hear during B.C.'s televised testimony. The trial judge then read the transcript of B.C.'s entire testimony to the jury, including the judge's preliminary questions asking if B.C. were going to tell the truth. The judge also informed the jury about the times when he and the attorneys waited while the equipment appeared to malfunction, which information was not contained in the transcript but which the judge evidently thought was important enough that he should tell the jury. When the trial judge finished reading B.C.'s testimony to the jury, he sent the jury back to the jury room to continue deliberations. The judge did not give the jury any further instructions.

At 4:45 p.m., the jury announced that it had reached a verdict. The jury found defendant guilty of predatory criminal sexual assault of a child.

Defendant filed a posttrial motion. At the hearing on the posttrial motion, defendant's attorney argued that allowing the jury to rehear B.C.'s testimony unfairly overemphasized it to the jury. Regarding the televised aspect of B.C.'s testimony, defendant's attorney stated:

"We didn't have a tape that we could review, so we are not sure what the [jurors] saw or didn't see. We don't know if they saw three-quarters of the tape or there were just bits and pieces that they missed. So I believe that her testimony was emphasized over and above that of the other witnesses. In addition, I would note that the [jurors] had made a statement that they may not be able to make a decision in this case if they didn't get to see the testimony. "

The State responded to the argument about the review of B.C.'s testimony as follows:

"I think the record is clear on this point. But if it is not, I will make sure it is of record. We had some technical problems. There was a tape within the camera. It recorded the direct testimony of the child. While we were in the room, we could hear the child without difficulty. Her voice was not being picked up by the microphones very well. We were told that the jury could not hear her. We tried to get her to speak up, thought we had the problem corrected. In viewing the tape of the direct testimony, your Honor, the audio part of that tape picked up my voice, but it wasn't picking up the child's voice. You couldn't hear the child when we played back the tape. There was a break between the direct and cross. When we went back on the record, I don't know why, your Honor, but the tape did not record the cross[-]examination, so it wasn't like we could play the tape back to the jury. I think we did it the only way we could."

After the attorneys concluded their arguments, the trial court made its findings:

"[A]s counsel are aware and as I want the record to be aware, there were some substantial problems with the videotape presentation. *** There was a problem with the sound. There was a problem with the video portion. The Circuit Clerk came in several times and said there was difficulty in the sound, that the jury could not hear[,] [and] [t]hen came back and said that the video went off. And also there is no record of this, but as of last Friday, the ballasts that were in the lights in the courtroom were repaired; but the ballasts had been making a loud humming sound for several months ***. *** Here, I believe, we have a situation that many of the things said by [B.C.] in this room from this witness stand they were hearing for the first time when I read to them from the transcript ***. *** So it is not really overemphasized but in some regards stating for the first time certain portions of the testimony they obviously had not heard. *** I am sure my visage did not engender sympathy for the victim or cause any prejudice to the defendant. So I believe there were substantial portions of the testimony that they actually did not hear. In fact, I believe [that] one of these jurors' inquiry [sic] was that they felt that a portion of the testimony was blacked out, and they did not hear a substantial portion of it when, in fact, there were just problems when the TV blacked out which were actually picked up from the point where the TV blacked out. So I don't find any prejudice to the defendant in that regard."

The trial court denied defendant's posttrial motion and sentenced him to 8½ years' imprisonment. This appeal followed.

## ANALYSIS

Defendant argues that he was denied a fair trial when the trial

judge read the complaining witness's testimony to the jury during deliberations. Defendant acknowledges that the law is well settled that the decision to allow a jury to review a witness's testimony is a matter within the discretion of the trial court, because the court is in the best position to determine whether a review of the testimony would aid the jury in reaching a verdict. See *People v. Tansil*, 137 Ill. App. 3d 498 (1985). Defendant argues, however, that the trial court abused its discretion in this case because allowing the jury to hear B.C.'s testimony a second time unfairly overemphasized it, especially since the trial judge read the testimony to the jury, giving it his implicit stamp of approval. See *People v. Sampson*, 86 Ill. App. 3d 687, 692 (1980). Defendant argues: "[T]here is no question that the jury heard the entire testimony of [B.C.] via the closed circuit television system. Therefore, reviewing the transcript of [B.C.]'s testimony could not have been helpful to the jury during its deliberations."

The State responds that the trial court did not err by reading B.C.'s testimony to the jury because the jury had *not* previously heard her entire testimony due to technical difficulties with the equipment used to televise her testimony. The State directs our attention to the hearing on defendant's posttrial motion, wherein the trial court stated that the jury did not hear "many of the things said by [B.C.]" during her televised testimony.

Clearly, the parties not only argue different positions; they argue different versions of the facts in the record. That is the reason we recited the facts concerning B.C.'s testimony, the notes the jury sent out, and the hearing on the posttrial motion in fairly great detail. Neither the State nor defendant is able to persuade us regarding exactly what the jury heard or saw of B.C.'s televised testimony, because there is no clear evidence of what actually happened. The record contains only the arguments or statements of counsel and the judge.

■ Defendant, as the appellant, is required to provide this court with a sufficiently complete record so that we can resolve all pending issues. See *People v. Barfield*, 288 Ill. App. 3d 578, 580 (1997). If a transcript of these matters is not available, defendant can provide a bystander's report or an agreed statement of facts outlining the essential details necessary for the court's resolution of the issue. See *People v. McClurg*, 195 Ill. App. 3d 381, 388 (1990); 166 Ill. 2d R. 323. If the appellant fails to provide the court with a sufficiently complete record, then the court of review can find that his arguments have been waived, unless the court finds that plain error occurred. See *People v. Barnett*, 173 Ill. App. 3d 477, 486 (1988). However, the waiver rule is a limitation on the parties and does not require the court of review to forego resolution of the issue. See *People v. Shaw*, 186 Ill. 2d 301

(1998). In the instant case, we choose to resolve the issue due to the magnitude of the constitutional deprivation that is in question. See *Pointer v. Texas*, 380 U.S. 400, 403, 13 L. Ed. 2d 923, 926, 85 S. Ct. 1065, 1067 (1965) (accused's sixth amendment right to confront witnesses against him is a fundamental right made obligatory on the states by the fourteenth amendment).

In this case, the main evidence came directly from the two parties involved, B.C. and defendant. The jury's decision was heavily, if not totally, dependent upon its resolution of the question of whose version of the facts it believed. There was evidence corroborating B.C.'s account, but there was also evidence that tended to corroborate defendant's account of the events. Since it is not clear from the record whether the jury saw or heard all of B.C.'s testimony, there is at least a possibility that the jury heard some portion of B.C.'s testimony for the first time as it was delivered by the trial judge.

■ Unless the jury saw and heard *all* of B.C.'s testimony, then the jurors lacked the ability to fully assess her credibility. Unless the jury watched B.C.'s demeanor while testifying, unless it was able to hear the inflections of her voice and whether she paused before answering, the jury could not fully assess whether it believed her testimony. See *People v. Hood*, 229 Ill. App. 3d 202 (1992) (the credibility of the witnesses and the weight given their testimony are determinations exclusively within the province of the jury, and where the resolution of guilt turns on the credibility of the witnesses, the jury is to determine that credibility since it has a superior opportunity to observe their manner and demeanor).

When a witness's testimony is read to the jury by another person, the full impact of the witness's demeanor cannot be determined, since the jury views the demeanor of the person reading the testimony instead of the demeanor of the witness. Thus, the full extent of B.C.'s credibility was lost on the jury unless it heard and saw her entire testimony as it was televised. Contrary to defendant's assertion, overemphasis is not the main problem with the trial court's reading of B.C.'s testimony. Rather, the main problems with the rereading of the testimony are: (1) we cannot be certain from this record if the jury had any basis upon which to rationally evaluate B.C.'s credibility, and (2) we cannot be certain if the jurors were influenced to give greater credibility to B.C.'s testimony because the judge read it to them.

■ The United States Supreme Court has determined that state statutes allowing a child sexual abuse victim to testify via closed circuit television do not necessarily violate the confrontation clause of the sixth amendment to the United States Constitution. See *Maryland v. Craig*, 497 U.S. 836, 111 L. Ed. 2d 666, 110 S. Ct. 3157 (1990). Never-

theless, under the Court's analysis in *Maryland*, the possibility that the jury could not hear and/or see portions of B.C.'s testimony may amount to a serious constitutional deprivation.

"The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. ***

\* \* \*

The combined effect of these elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Maryland*, 497 U.S. at 845-46, 111 L. Ed. 2d at 678-79, 110 S. Ct. at 3163.

In another case, the Supreme Court explained the original purpose of the confrontation clause as follows:

" 'The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits ... being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him[ ] and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' " *Kentucky v. Stincer*, 482 U.S. 730, 736-37, 96 L. Ed. 2d 631, 641-42, 107 S. Ct. 2658, 2662 (1987), quoting from *Mattox v. United States*, 156 U.S. 237, 242-43, 39 L. Ed. 409, 410-11, 15 S. Ct. 337, 339 (1895).

■ In the case at bar, we cannot be assured that one of the necessary elements of confrontation—the trier of fact's ability to observe the demeanor of an essential witness—was present. Without all of the elements of confrontation, we cannot be assured that the jury had an adequate basis for evaluating the truth of B.C.'s testimony. See *Dutton v. Evans*, 400 U.S. 74, 89, 27 L. Ed. 2d 213, 227, 91 S. Ct. 210, 220 (1970). This factor is especially important in a case where the complaining witness is allowed to give her testimony outside the presence of the defendant, since the procedure allowing for the televised testimony by its nature voids the defendant's right to confront his accusers face to face. See *Maryland*, 497 U.S. at 860, 111 L. Ed. 2d at 688, 110 S. Ct. at 3171 (Scalia, J., dissenting) (arguing that state statutes allowing child victims of sexual abuse to testify via closed circuit television outside the presence of the defendant violated the clear mandate of the confrontation clause). We recognize the serious

emotional trauma that an appearance in a criminal trial can have on young children. The legislature recognized this by providing the statutory permission to use closed circuit television technology in this type of case. 725 ILCS 5/106B—5 (West 1996). However, when using this exception to the requirements of the confrontation clause of the United States Constitution, our courts must assure that the video equipment will be technologically efficient and constantly monitor the equipment to prevent such events as occurred in this trial.

■ Moreover, although the trial judge stated that he did not feel that his reading of B.C.'s testimony influenced the jury one way or the other, we emphatically disagree. The trial judge must exercise extreme caution to avoid improperly influencing the jury, for the trial judge is believed to have "immense influence over the jury." *People v. Brown*, 200 Ill. App. 3d 566, 576 (1990). When the trial judge read the testimony to the jury, he was still presiding over the trial. It is far too likely that the jurors were influenced to believe the words credited to B.C. as they were spoken by the trial judge, not because they believed B.C., but because they believed the judge.

This is especially so where the trial judge asked numerous leading questions of the witness at the beginning of her testimony, repeatedly eliciting from her that she would tell the truth. Such questions might not amount to error when they are brief and part of the customary introductory testimony. In this case, however, those questions were lengthy, were asked by the trial judge, and were repeated when the trial judge read B.C.'s testimony to the jury. Where, as here, the credibility of the complaining witness was essential to the outcome of the trial, the influence of the trial judge reading that witness's entire testimony cannot be discounted.

The timing of the decision to read the transcript to the jury also leads to the conclusion that the jury was influenced to convict defendant only after it heard the judge read B.C.'s testimony. The jury sent out its second note sometime before 4 p.m.: "[We] need a copy of [B.C.]'s testimony because of [the] poor quality of the video we watched during the hearing." The note also stated: "Without the transcript I'm afraid we may not be able to come to a decision."

After the jury's second note, the record is silent as to whether the trial judge conferred with the attorneys and defendant and, if so, whether defendant's attorney objected to the judge reading the transcript. All that can be gleaned from the record is that the trial court had a transcript prepared and then read the transcript to the jury. The transcript itself was not marked as an exhibit, and we have no way to review it to establish even whether it was identical to the trial judge's reading. We note there is no record to determine whether

the transcript read by the trial judge was even certified by the court reporter who presumably transcribed it. There is no record of who prepared the transcript or from what source. Therefore, we cannot be certain that the words read by the judge were actually the words spoken by B.C. Almost immediately after hearing the judge read the transcript of what B.C. purportedly said, the jury returned a guilty verdict. Thus, the inference that the jury was persuaded by the judge's influence to reach a verdict of guilty is inescapable.

In the case at bar, defendant claims that the error of the trial judge reading B.C.'s testimony to the jury denied him a fair trial. We agree. Specifically, we find a violation of defendant's right to confront and cross-examine the witnesses against him, as guaranteed by the confrontation clause of the sixth amendment to the United States Constitution and article I, section 8, of the Illinois Constitution. See *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967); see also *People v. Simms*, 121 Ill. 2d 259, 276 (1988) (where constitutional error is at issue, the defendant's interests are heightened, and the harmless-error standard shifts to the State the burden of proving beyond a reasonable doubt that the error did not affect a given decision). The State has not met its burden of proving beyond a reasonable doubt that the errors discussed did not affect the jury's decision herein.

■ We next consider defendant's claim that the trial court erred when it allowed defendant's statement about doing "bad things" to be used against him, since this issue may arise on retrial. Defendant claims that the statement was irrelevant and its prejudicial impact outweighed its probative value. The State counters that the trial court did not abuse its discretion by admitting the statement, because the statement was a direct response to a specific question, and *"[a]ny* statement by an accused person, unless excluded by the privilege of self-incrimination or other exclusionary rules, may be used against him as an admission." (Emphasis in original.) See *People v. Layne*, 286 Ill. App. 3d 981, 989 (1997). We find for several reasons that the trial court abused its discretion in admitting the portion of defendant's statement about having "done a lot of bad things."

First, the portion of the statement that was admitted is misleading. Before the trial, outside the presence of the jury, Ramsey explained that he questioned defendant as to whether defendant had touched B.C. inappropriately:

"His response was he was arrested in Maine when he was thirteen for gross sexual misconduct, that he had done a lot of bad things *in the past*." (Emphasis added.)

However, when the State questioned Ramsey during the trial, in the

presence of the jury, the words "in the past" were not included. The statement admitted to the jury conveyed only that defendant had "done a lot of bad things" without establishing that defendant was referring to the "past." Therefore, the statement was misleading.

Second, we agree with defendant that the admission of the statement put him in the untenable position of having no way to explain his statement unless he told the jury about his prior juvenile conviction, which the trial court correctly ruled was inadmissible. See 705 ILCS 405/1—10 (West 1996). When the trial court admitted a portion of the second half of the statement Ramsey ascribed to defendant, it prejudiced defendant by forcing him to reveal inadmissible and prejudicial information in order to properly defend himself by clarifying his statement.

Third, the statement as admitted to the jury conveyed that defendant had done a "lot of bad things." As such, it was "extrinsic acts" evidence. Evidence of prior bad acts or crimes is admissible only if it is "relevant to establish any material question other than to show propensity to commit crime." See *People v. Davis*, 248 Ill. App. 3d 886, 891 (1993). The State did not argue that the evidence tended to prove any fact other than defendant's guilt. The statement was not a confession to the crime charged, and Ramsey admitted that defendant never confessed to any crime. Therefore, the only conclusion the jury could possibly draw from this statement is either that it was irrelevant to the question of defendant's guilt or that defendant must be guilty of the crime charged since he did "a lot of bad things." The trial court abused its discretion by admitting this irrelevant statement, because it had no probative value for any material question before the jury and because it was highly prejudicial to defendant.

For all of these reasons, we reverse and remand for a new trial.

Reversed and remanded.

MAAG and KUEHN, JJ., concur.