THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LEMAR H. MOORE, Defendant-Appellant.

Second District No. 2—02—0367

Opinion filed September 16, 2003.—Rehearing denied October 16, 2003.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Josette Skelnik, of State Appellate Defender's Office, of Chicago, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Kristine A. Karlin, of Mt. Prospect, for the People.

JUSTICE BYRNE delivered the opinion of the court:

Following a jury trial, defendant, Lemar H. Moore, was convicted

of first-degree murder (720 ILCS 5/9—1(a)(1) (West 2000)). The trial court imposed a 50-year sentence after concluding that defendant was eligible for a 25-year sentence enhancement based on his use of a firearm during the offense. Defendant appeals, alleging that several trial errors entitle him to a new trial. Defendant contends that the trial court erroneously (1) refused to instruct the jury on second-degree murder based on provocation and on the defense of self-defense; (2) failed to consider a jury inquiry regarding the testimony of Stacey Pitts, a prominent prosecution witness; and (3) added 25 years to the sentence for defendant's use of a firearm. We affirm.

## FACTS

At trial, Pitts testified that she first met the victim, Johnny Legaretta, in February 2001 in the Waukegan neighborhood where they both lived. The two became good friends and saw each other daily. On July 2, 2001, Pitts walked to Legaretta's house, and at 5 p.m. the two walked down McAlister Street toward Belvidere Road. As they walked, Legaretta carried a notebook of his poetry, and Pitts did not see him with a weapon. As they approached Belvidere Road, Pitts heard Legaretta cursing but did not see the recipient of his comments. As Pitts and Legaretta turned onto Belvidere Road, a light blue car approached and slowed. A passenger yelled, "Where's my mother's chain?" Legaretta responded, "Go home and look for it," because Legaretta did not have the chain.

The blue car pulled into the parking lot of a nearby grocery store. The driver went inside the store, and the passenger, identified as defendant, ran toward Pitts and Legaretta. Defendant repeatedly asked, "Where's my mother's chain?" Legaretta continued to state that he did not have it and that defendant should return home to look for it. Legaretta attempted to walk past defendant, and defendant punched him in the face twice. Legaretta handed his notebook to Pitts, who told Legaretta not to fight defendant. Legaretta responded, "No it's fun, it's fun."

As Legaretta walked back toward defendant, defendant punched him a third time. Legaretta struck defendant at least four times, and Pitts saw that a handgun was tucked in the right side of defendant's waistband. Defendant showed the gun to Legaretta, and Legaretta asked whether defendant was threatening him. The two men argued, and Pitts turned her head momentarily just as she heard a loud gunshot. Pitts turned back and saw that Legaretta and defendant were still arguing and fighting. The two men got closer to one another, and Pitts heard a second gunshot. Pitts recalled that defendant held the gun and that Legaretta never attempted to seize it.

Legaretta leaned against the fence behind him, gasped for air, and lay on his back. Defendant ran to the blue car, and the car sped away. Pitts ran to the grocery store and spoke to the police on the telephone. Pitts later identified the driver as Ronald Harris. Pitts could not say whether Legaretta and defendant ever grabbed one another during the fight because Pitts did not see everything that occurred.

Juan Marban, the owner of the grocery store, testified that he was repairing a light in the store's entrance at the time of the altercation. A blue car pulled up and defendant walked toward two people across the street. The driver entered the store, stood behind Marban, and stared outside. Marban stated that "everything happened at once." He heard two gunshots and saw defendant holding a gun and covering his face. The man standing behind Marban said, "Jesus," exited the store, and drove away with defendant. Marban dialed 911 and handed the phone to Pitts, who had entered the store. Marban did not see defendant and Legaretta punching each other. Marban believed that the two men were standing four feet apart when the shots were fired, but Marban acknowledged that he told a police officer that he asked the man in the store what had happened.

George Callison testified that he and his wife were driving along Belvidere Road and saw two men in a fistfight on the sidewalk. Legaretta was swinging his arms out from his sides and was not making contact. Callison saw defendant, who was "literally up against" Legaretta, strike Legaretta with a left-hand uppercut. Legaretta fell against the fence, slid to his knees, and bled from his chest. Callison almost struck defendant as defendant ran across the street. Callison did not hear any gunshots, and he believed that Legaretta had suffered a stab wound.

Callison stated that Legaretta obstructed his view of defendant and that he could see only defendant's left arm. It did not appear that Legaretta tried to grab defendant or anything he was holding. Callison did not see Legaretta strike defendant. Callison also did not see Legaretta hand anything to Pitts, who stood 10 to 20 feet away from the fight.

Regina Coburn testified that she loaned Harris her blue Dodge Aries on the day of the incident. Regina and her husband picked up defendant and Harris, and the four drove to an address in Waukegan where Regina purchased rock cocaine. While driving home, Regina heard Harris yell out the window, "Hey, remember when such and such busted you in the nose?" Regina saw two pedestrians, but they did not respond to Harris's comment. Upon arriving home, Regina and her husband smoked the cocaine, and Harris and defendant left with the car.

At approximately 5 p.m., Harris returned to Regina's home without the car. Defendant arrived 15 to 20 minutes later and changed his clothes and hairstyle. Defendant told Regina that her car was parked safely behind a church but that she could not retrieve it until after dark. Regina accepted $5 for securing defendant a ride out of the area. Regina discovered her car with yellow police tape around it behind a church. The police who were there transferred her to the station for questioning.

Joseph Coburn, Regina's husband, testified that, when Regina was purchasing the drugs, defendant exited the car momentarily and Joseph saw a gun in defendant's waistband. After Regina returned to the car and began driving home, Joseph saw a young man and woman walking down the street. Harris yelled something to the pedestrians, and the young man swore at Harris. Harris told defendant, "I bet you don't remember him." Defendant responded that he remembered the man as the person who had stolen his mother's necklace. Defendant stated, "I ought to kick his ass" and asked Harris, "You want to ride down on him?" Harris responded, "No. We going [sic] to do something else different."

Officer Robert Kerkorian testified that he arrested defendant at the home of Harris's father and stepmother on the night of the incident. Defendant did not complain of any pain, and Kerkorian did not observe any injuries or bruises. Like Kerkorian, Officer Michael Sellers testified that defendant was not injured at the time of the arrest. Lieutenant Jonathon Oliver testified that defendant helped him locate the gun used in the shooting.

Dr. Mark Witek testified that he performed an autopsy on Legaretta. Legaretta suffered three gunshot wounds that formed a triangle near the upper center part of his chest. Any of the three shots could have killed Legaretta. The trajectory of each bullet was downward from right to left, which indicated that Legaretta could have been reaching with his right hand and leaning forward when he was shot.

The parties stipulated that Christopher Luckie, a forensic scientist, would testify that his chemical examination of gunpowder residue on Legaretta's shirt suggested that Legaretta was shot at close range. Luckie opined that Legaretta was shot once from approximately one foot away and twice from slightly farther away. The closest shot could have been fired from six inches away. A trigger pull test disclosed that the gun was relatively difficult to fire: a single-action shot, where the firearm is cocked manually before firing, required 4.5 pounds of force and a double-action shot, where the firearm is not cocked, required at least 16 pounds. Luckie acknowledged that the combined force of pulling the gun barrel in one direction and pulling the trigger in the opposite direction could make it easier to discharge the weapon.

Venus Anderson, defendant's mother, testified that she was Lega-retta's legal guardian for two years before he turned 18. During that period, defendant and Legaretta lived with Anderson and called her "mother." Legaretta moved out but returned a couple of years later to live with Anderson temporarily. When Legaretta left again, Anderson discovered that her gold chain was missing. Anderson informed her family that she suspected Legaretta had stolen the chain.

At the close of the evidence, the trial court conducted a jury instruction conference off the record. When the parties went back on the record, the State conceded that the jury should be instructed on second-degree murder based on an unreasonable belief in the need for self-defense. However, the State objected to instructions on (1) second-degree murder based on the provocation of mutual combat and (2) self-defense. The court ruled for the State on the jury instruction issues.

During its deliberations, the jury sent the court three notes, including two requesting transcripts of certain witnesses' testimony. Defense counsel objected to providing the jury with the trial testimony of fewer than all of the witnesses, and the court declined the requests in writing on each note. The record contains a fourth note requesting a transcript of Pitts's testimony, but the note lacks any indication that the trial court ruled on it.

The jury found defendant guilty of first-degree murder. Noting that section 5—8—1(a)(1)(d)(iii) of the Unified Code of Corrections (Code of Corrections) (730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2000)) mandated a 25-year sentencing enhancement, the trial court imposed a 50-year prison term. Defendant filed posttrial motions raising the jury instruction and sentencing issues, and the court denied the motions. The motions did not mention the court's failure to consider the jury question regarding Pitts's testimony. This timely appeal followed.

## ANALYSIS

### 1. Jury Instructions

■ On appeal, defendant initially argues that the trial court erroneously declined his tendered jury instructions on second-degree murder based on the provocation of mutual combat and on the defense of self-defense. Jury instructions should guide the jury in its deliberations and help it reach the proper verdict through application of legal principles to the evidence. *People v. Santos*, 333 Ill. App. 3d 1, 7 (2002). Very slight evidence of a defendant's theory of the case will justify the giving of a tendered instruction. *Santos*, 333 Ill. App. 3d at 7. A court's decision to decline a particular instruction is subject to an abuse-of-discretion standard of review. *People v. Edmondson*, 328 Ill. App. 3d

661, 664 (2002). Even if the trial court errs in denying a particular instruction, the decision is subject to a harmless error analysis and may be affirmed if evidence of defendant's guilt was so clear and convincing as to render the error harmless beyond a reasonable doubt. *People v. Dennis*, 181 Ill. 2d 87, 95-96 (1998); *People v. Amaya*, 321 Ill. App. 3d 923, 929 (2001).

### a. *Second-Degree Murder Instruction*

■ A defendant is entitled to a jury instruction on second-degree murder based on provocation if "some evidence" of serious provocation existed in the record which, if believed by the jury, would reduce the crime from first-degree murder to second-degree murder. *People v. Delgado*, 282 Ill. App. 3d 851, 857 (1996). A person commits the offense of second-degree murder when he commits the offense of first-degree murder and, at the time of the killing, he is acting under a sudden and intense passion resulting from serious provocation by the individual killed. 720 ILCS 5/9—2(a)(1) (West 2000). "Serious provocation" is conduct sufficient to excite an intense passion in a reasonable person. 720 ILCS 5/9—2(b) (West 2000).

■ Mutual combat is one of the recognized forms of serious provocation sufficient to reduce first-degree murder to second-degree murder. *People v. Garcia*, 165 Ill. 2d 409, 429 (1995). "Mutual quarrel or combat" has been defined as a fight or struggle that both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat. *People v. Williams*, 315 Ill. App. 3d 22, 35 (2000). The defendant's retaliation must be proportionate to the provocation (*People v. Shaw*, 278 Ill. App. 3d 939, 952 (1996)), and a defendant who instigates combat may not rely upon the victim's response as evidence of mutual combat sufficient to reduce first-degree murder to second-degree murder (*Delgado*, 282 Ill. App. 3d at 859). Factors to consider include, but are not limited to, the defendant's testimony, his intent or motive, the type of wound suffered by the victim, the combatants' history of violence, physical contact between the defendant and the victim, and the circumstances surrounding the incident. *Edmondson*, 328 Ill. App. 3d at 664.

■ In arguing that a second-degree murder instruction was appropriate, defendant cites Pitts's testimony that Legaretta stepped away from defendant, handed Pitts his notebook, and returned to fight defendant because it was "fun." Defendant argues that this testimony was evidence that Legaretta engaged in mutual combat. However, the totality of evidence indicates that defendant was the aggressor in this case, he used excessive force under the circumstances,

and he and Legaretta did not fight on equal terms. Defendant instigated the incident by confronting Legaretta on the street and accusing him of theft. Defendant escalated the situation when he repeatedly punched Legaretta, who was attempting to walk away. Although Legaretta fought back with his fists, defendant escalated the situation even further by brandishing a gun and firing three shots into the center of Legaretta's chest. There was no evidence that Legaretta attempted to grab the gun when he saw it in defendant's waistband. Defendant was 3 inches taller and 20 to 30 pounds heavier than Legaretta, and there was no evidence that Legaretta was armed or had a violent history. Although Pitts's testimony indicates that Legaretta willingly entered a fistfight, nothing suggests that Legaretta would have done so if he had known that defendant would draw a gun. We conclude that the trial court did not abuse its discretion in declining the tendered jury instruction on second-degree murder based on mutual combat because defendant instigated the combat and he and Legaretta fought on unequal terms. See *Delgado*, 282 Ill. App. 3d at 859.

### b. *Self-Defense Instruction*

At trial, the State conceded that the jury should be instructed that defendant could be found guilty of second-degree murder based on his unreasonable belief that self-defense was necessary. The court administered that instruction but denied a defense-tendered instruction on the affirmative defense of self-defense. Defendant argues on appeal that these rulings are inconsistent and that the denial of the self-defense instruction constitutes an abuse of discretion. We disagree.

■ Self-defense is an affirmative defense, and once a defendant raises it, the State bears the burden of disproving it beyond a reasonable doubt. *People v. Young*, 323 Ill. App. 3d 1078, 1089 (2001). Self-defense exists when (1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm is imminent; (4) the threatened force is unlawful; (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively *reasonable*. If the State negates any one of the elements of self-defense during a trial for first-degree murder, the defendant's self-defense claim fails and the jury must find him guilty. *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995).

■ A person commits second-degree murder when he commits the offense of first-degree murder and, at the time of the killing, he believes the circumstances to be such that, if they exist, would justify the use of deadly force under the principles of self-defense, but his belief is *unreasonable*. 720 ILCS 5/9—2(a)(2) (West 2000).

■ Citing *People v. Lockett*, 82 Ill. 2d 546 (1980), defendant argues that "if the evidence supports the giving of a second-degree murder instruction based upon an unreasonable belief in self-defense, it also supports the giving of a self-defense instruction." Defendant misstates the law. The *Lockett* court held that "if the evidence supports a self-defense instruction, it will also support a voluntary manslaughter [now second-degree murder (720 ILCS 5/9—2(a)(2) (West 2000))] instruction." *Lockett*, 82 Ill. 2d at 551. Unlike second-degree murder based on an unreasonable belief that self-defense is necessary, the affirmative defense of self-defense requires proof that the beliefs of the person threatened were objectively reasonable. Therefore, the evidence adduced at a trial will support a second-degree murder instruction but not a self-defense instruction if there is no evidence that the defendant was acting under an objectively reasonable belief that he was threatened.

■ We reject defendant's contention that the trial court should have instructed the jury on the defense of self-defense. There was no evidence that defendant acted under an objectively reasonable belief that the threat Legaretta presented required the use of a handgun. Callison testified that Legaretta was swinging his arms out from his sides and did not make contact with defendant. Although his view was partially obstructed, Callison did not believe that Legaretta tried to grab defendant or anything he was holding. Nothing in the record suggests that Legaretta was armed or would have used deadly force during the altercation, and no one testified that Legaretta attempted to seize the gun. We conclude that the trial court did not abuse its discretion in declining to instruct the jury on self-defense because no evidence showed that defendant's conduct was objectively reasonable.

We note that the tendered self-defense instruction was inappropriate for other reasons. Defendant was the aggressor in this case because he instigated and escalated the conflict. Furthermore, there was no evidence that defendant actually and subjectively believed that Legaretta was armed or would have used deadly force during their altercation. These circumstances provide additional support for our conclusion on the self-defense instruction issue. See *Jeffries*, 164 Ill. 2d at 127-28. Because a finding of even an unreasonable use of self-defense still requires evidence that the defendant was not the aggressor and subjectively and actually believed that the force applied was necessary (*Jeffries*, 164 Ill. 2d at 127-28), the dearth of evidence on these elements suggests that the trial court would not have abused its discretion if it had declined to instruct the jury on second-degree murder. Although the evidence suggests that defendant was not entitled to the instruction, the court's use of the instruction benefitted defendant because it allowed the possibility of a conviction of a lesser offense.

## 2. Jury Request for Transcript of Testimony

■ We next address defendant's contention that the trial court's failure to consider the jury question regarding Pitts's testimony is reversible error. The court's failure to consider the jury's request is tantamount to a denial of the request. The decision to grant or deny a jury's request for transcripts of witness testimony rests within the sound discretion of the trial court, and its decision will not be disturbed absent an abuse of discretion. *People v. Fisher*, 281 Ill. App. 3d 395, 406 (1996). The trial court is in the best position to determine whether a review of the testimony would aid the jury in reaching its verdict. *People v. Miller*, 311 Ill. App. 3d 772, 781 (2000). However, the decision must be based on objective factors, such as whether the testimony is fresh in the jurors' minds and the hardship of obtaining a transcript within a reasonable time. *Fisher*, 281 Ill. App. 3d at 406.

■ Very soon after the start of deliberations, the jury sent the court two notes requesting transcripts of the testimony of Callison and one of the State's expert witnesses. Defense counsel objected, arguing that the transcripts would unduly emphasize the witnesses' testimony. Defendant's argument on appeal that the jury should have received a transcript of Pitts's testimony is disingenuous because it is inconsistent with his position at trial and because defendant does not explain why Pitts's testimony should have been treated any differently than the remaining testimony. See *People v. Cortes*, 181 Ill. 2d 249, 283 (1998) (it is manifestly unfair for a defendant to complain of errors that he injects into his own trial). After arguing at trial that the jury's transcript requests should be denied, defendant may not argue on appeal that the jury should have received a transcript of Pitts's testimony. We conclude that, even if the trial court abused its discretion in failing to consider the jury's request for Pitts's testimony, the error was harmless in light of defendant's trial strategy.

## 3. Twenty-Five-Year Sentence Enhancement

Finally, defendant argues that he received an unconstitutional sentence when the trial court imposed the 25-year sentence enhancement mandated by section 5—8—1(a)(1)(d)(iii) of the Code of Corrections. Defendant argues that the 25-year extension violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) and constitutes improper double enhancement.

■ Public Act 91—404 amended the penalty provisions of several statutes by adding what have been referred to as the "15/20/25-to-life" provisions. Pub. Act 91—404, § 5, eff. January 1, 2000. Under these provisions, a mandatory enhancement is added to the defendant's sentence if he used a firearm in the commission of the offense. The

length of the enhancement depends on how the firearm was used. *People v. Moss*, 206 Ill. 2d 503, 506 (2003).

■ In this case, defendant was charged with first-degree murder (720 ILCS 5/9—1(a)(1) (West 2000)), whose penalty was amended by Public Act 91—404. The potential penalty for first-degree murder is ordinarily 20 to 60 years' imprisonment. 730 ILCS 5/5—8—1(a)(1)(a) (West 2000). At sentencing, the trial court imposed a 25-year term and added a 25-year sentencing enhancement under section 5—8—1(a)(1)(d)(iii), which provides in relevant part:

"(a) Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for first degree murder,

\* \* \*

(d)(iii) if, during the commission of the offense, the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2000).

■ A statute is presumed constitutional, and the party challenging the statute bears the burden of demonstrating its invalidity. *Moss*, 206 Ill. 2d at 519-20; *People v. Malchow*, 193 Ill. 2d 413, 418 (2000). A court has a duty to construe a statute in a manner that upholds its validity and constitutionality if it can reasonably be done. *Malchow*, 193 Ill. 2d at 418. The question of whether a statute is constitutional is subject to *de novo* review. *People v. Carney*, 196 Ill. 2d 518, 526 (2001).

## a. *Proportionate Penalties Clause*

■ Defendant argues that the 25-to-life sentence enhancement for a first-degree murder committed by shooting the victim violates the proportionate penalties clause of the Illinois Constitution. The proportionate penalties clause dictates that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

When a defendant alleges a proportionate penalties violation, the court must decide whether the penalty at issue has been set by the legislature "according to the seriousness of the offense." Ill. Const. 1970, art. I, § 11; *People v. Lombardi*, 184 Ill. 2d 462, 473-74 (1998) (proportionate penalties clause requires the legislature to proportion

penalties according to the seriousness of offenses). Our supreme court has employed three separate tests in making this determination. First, a penalty violates the proportionate penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community. *Lombardi*, 184 Ill. 2d at 474; *People v. Bailey*, 167 Ill. 2d 210, 236 (1995). Second, a penalty violates the proportionate penalties clause where similar offenses are compared and conduct that creates a less serious threat to the public health and safety is punished more severely. See *Lombardi*, 184 Ill. 2d at 474; *People v. Davis*, 177 Ill. 2d 495, 503 (1997). Finally, the proportionate penalties clause is violated where offenses with identical elements are given different sentences. See *People v. Walden*, 199 Ill. 2d 392, 394 (2002); *People v. Lewis*, 175 Ill. 2d 412, 417-18 (1996).

Defendant argues that the 25-to-life sentence enhancement for first-degree murder committed by shooting the victim violates the proportionate penalties clause because another defendant would be ineligible for the enhancement if he committed first-degree murder through "stabbing, bludgeoning, hanging, or torture." Defendant contends that, "[b]ecause, under the statute at issue, defendants who stand convicted of the same offense—i.e., first-degree murder—face substantially disparate penalties based upon a factor unrelated to the seriousness of the offense, this statute violates the proportionality clause of the Illinois [C]onstitution, and the defendant's additional 25-year sentence must be vacated."

Defendant essentially proposes a cross-comparison analysis of two types of first-degree murder: those in which the victim is shot and those in which the victim is killed by other means. In *People v. Hill*, 199 Ill. 2d 440 (2002), our supreme court engaged in a similar "same-statute inquiry" where the defendant argued that different versions of the home invasion statute (720 ILCS 5/12—11(a)(1) through (a)(5) (West 2000)) violated the proportionate penalties clause.

 The cross-comparison analysis involves two steps. First, we consider whether the purposes of the compared statutes are distinct such that comparative proportionality review is not appropriate. *Hill*, 199 Ill. 2d at 454. It is well settled that if the statutory purposes are different, comparative proportionality review is inappropriate (*Davis*, 177 Ill. 2d at 506) because, where statutes are enacted for different purposes, we presume that the legislature considered different factors in establishing the respective punishments, and we defer to the legislature's judgment (*Walden*, 199 Ill. 2d at 395; *Lombardi*, 184 Ill. 2d at 476).

Second, if the purposes are related, we consider whether the offense with the harsher penalty is more serious than the offense with

the less severe penalty. *Hill*, 199 Ill. 2d at 454. The determination of whether a particular offense is more serious than another is not limited to an examination of the degree of harm inflicted. While that is a relevant consideration, the legislature may consider other factors, such as the frequency of the crime and the high risk of bodily harm associated with it. Also, the legislature may perceive a need to enact a more stringent penalty provision to halt an increase in the commission of a particular crime. As an institution, the legislature is better equipped than the judiciary to identify and remedy the evils confronting our society and is more capable of gauging the seriousness of an offense. Therefore, courts will generally defer to the legislature's conclusion that a particular offense is more serious than another. As with any challenge to a statute's validity, the defendant bears the burden of establishing each prong of this test. *Hill*, 199 Ill. 2d at 454.

In *Hill*, the defendant committed home invasion while armed with a firearm under section 12—11(a)(3) of the Criminal Code of 1961 (720 ILCS 5/12—11(a)(3) (West 2000)). Section 12—11(a)(1) (home invasion while armed with a dangerous weapon other than a firearm) and section 12—11(a)(2) (home invasion that causes an injury) mandate a Class X felony sentence of 6 to 30 years' imprisonment when force is used or injury occurs. In enacting Public Act 91—404, the legislature added sections 12—11(a)(3) through (a)(5) to incorporate the "15/20/25-to-life" sentencing enhancements for home invasions involving firearms. For instance, section 12—11(a)(3) mandates a Class X felony sentence of 6 to 30 years' imprisonment plus an additional 15 years where a defendant, while armed with a firearm, uses or threatens force regardless of whether injury occurs. *Hill*, 199 Ill. 2d at 453.

Our supreme court held that the penalties prescribed by the five subsections of section 12—11(a) are not disproportionate. The court concluded that, by amending the home invasion statute pursuant to Public Act 91—404, the legislature "essentially intended to break the offense of home invasion into two distinct categories: offenses committed without a firearm and offenses committed with a firearm." *Hill*, 199 Ill. 2d at 457. The purpose of subsections (a)(1) and (a)(2) is to protect the safety of people in their homes. In contrast, the purpose of the harsher penalties of subsections (a)(3) through (a)(5) is to protect the safety of people in their homes from an intruder carrying a firearm; discharging a firearm; or discharging a firearm and causing great bodily harm, permanent disability, permanent disfigurement, or death. *Hill*, 199 Ill. 2d at 457.

In reaching its conclusion, the *Hill* court cited the legislative history of Public Act 91—404. The court noted that Public Act 91—404

was unanimously passed by the legislature and mandates the stricter 15/20/25-to-life add-on sentencing scheme for enumerated crimes when they are committed with a firearm. "Public Act 91—404 included a package of amendments implementing sweeping changes to criminal sentences for the purpose of deterring and penalizing the illegal use of firearms." *Hill*, 199 Ill. 2d at 458. The court quoted the legislative debates as follows:

" 'The purpose behind the sentence enhancement *** for the use of a firearm in the commission of specified serious felonies is to deter the use of firearms in the commission of those violent and serious crimes. *** It's the intent of this bill that additional firearm enhancements are necessary and appropriate for deterring use of a firearm in the commission of our most serious offenses.' " *Hill*, 199 Ill. 2d at 458, quoting 91st Ill. Gen. Assem., Senate Proceedings, March 25, 1999, at 286-87 (statements of Senator Dillard).

The supreme court concluded that the purposes of sections 12—11(a)(1) and (a)(2) are sufficiently distinct from those of section 12—11(a)(3) to render proportionality review inappropriate because the new firearms provisions of the home invasion statute serve a second, more specific purpose and target a unique type of danger. *Hill*, 199 Ill. 2d at 458-59.

█ The rationale of *Hill* supports a similar conclusion here because Public Act 91—404 added the 15/20/25-to-life sentencing scheme to both home invasion and first-degree murder. By amending the sentencing statute for first-degree murder pursuant to Public Act 91—404, the legislature intended to create two categories of first-degree murder: those committed without a firearm and those committed with a firearm. See *Hill*, 199 Ill. 2d at 457. Under the statute as amended, the purpose of the penalties of sections 5—8—1(a)(1)(d)(i) through (d)(iii) is to more harshly punish those first-degree murderers who, respectively, carry a firearm; discharge a firearm; and discharge a firearm and cause great bodily harm, permanent disability, permanent disfigurement, or death. *Cf. Hill*, 199 Ill. 2d at 457 (home invasion). Comparative proportionality review is inappropriate here because the new firearms provisions of the first-degree murder sentencing statute serve a second, more specific purpose and target a unique type of danger that is absent when the offender does not possess a firearm. See *Hill*, 199 Ill. 2d at 458. Given the pervasive and enhanced danger from an offender's possession of a firearm, the legislature's superior position in identifying and addressing the evils of gun-related violence, and the presumptive constitutionality of a legislative enactment, we conclude that defendant has not met his burden of proving that section 5—8—1(a)(1)(d)(iii) violates the proportionate penalties clause of the Illinois Constitution. See *Hill*, 199 Ill. 2d at 458-59.

We note that, in *People v. Morgan*, 203 Ill. 2d 470 (2003), our supreme court held that "the attempt statute (720 ILCS 5/8—4 (West 2000)), as amended by Public Act 91—404, is unconstitutional because it permits a defendant convicted of attempted first degree murder to be subject to penalties that are not set according to the seriousness of the offense." *Morgan*, 203 Ill. 2d at 491. The attempt statute as amended provides that a defendant who intends to kill but fails to cause the death of his victim shall be convicted of attempted first-degree murder, whether or not mitigating circumstances exist, and shall be sentenced to 6 to 30 years' imprisonment, with the mandatory addition of 15 years, 20 years, or 25 years to life, depending on whether a firearm was in the defendant's possession, discharged, or the cause of bodily harm or the death of another. *Morgan*, 203 Ill. 2d at 491. "At the same time, a defendant who intends to kill *and succeeds in causing the death of the victim*, whether or not a firearm is used in the commission of the offense, will be subject to a sentencing range of 4 to 20 years (730 ILCS 5/5—8—1(1.5) (West 2000)) and may even be eligible for a sentence of probation (730 ILCS 5/5—6—1 (West 2000)) if the defendant can demonstrate that he acted under serious provocation or while possessing the unreasonable belief that self-defense was necessary." (Emphasis in original.) *Morgan*, 203 Ill. 2d at 491-92. The court found the attempt statute unconstitutional because it could expose a defendant to a *greater* sentence if the victim survived. *Morgan*, 203 Ill. 2d at 492.

This case is distinguishable from *Morgan*. The *Morgan* court found that the attempted first-degree murder statute violated the proportionate penalties clause because a defendant could be punished less severely if the victim did not survive. Here, the first-degree murder statute reflects the legislature's intent to punish more severely a defendant's use of a firearm in the commission of the offense. Defendant's use of a firearm created a more serious threat to the public health and safety, and therefore could be punished more severely.

### b. *Double Enhancement*

■ "Double enhancement occurs when a single factor is used 'both as an element of a defendant's crime *and* as an aggravating factor justifying the imposition of a harsher sentence than might otherwise have been imposed.' " (Emphasis in original.) *Moss*, 206 Ill. 2d at 533, quoting *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992). The general prohibition against double enhancement is a rule of statutory construction. *Moss*, 206 Ill. 2d at 533.

■ Defendant argues that the 25-year term added to his sentence

is an improper double enhancement because "the same factor—an individual's death—is used both to constitute the offense of first-degree murder and to enhance the defendant's sentence." We disagree. Defendant's use of a firearm to cause the death of the victim, not the death itself, is the factor that rendered him eligible for the 25-to-life sentence enhancement. The firearm factor is not necessary to prove defendant guilty beyond a reasonable doubt of first-degree murder. Therefore, we conclude that the firearm factor of section 5—8—1(a)(1)(d)(iii) of the Code of Corrections accounts for only one enhancement. See *Moss*, 206 Ill. 2d at 534.

For the preceding reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

HUTCHINSON, P.J., and BOWMAN, J., concur.