2020 IL App (2d) 170500-U
No. 2-17-0500
Order filed April 29, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-1683 |
| JUAN GUAJARDO, | ) ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Zenoff and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court, in a bench trial, did not: (1) err in finding that defendant was guilty of second-degree murder due to imperfect self-defense; and (2) consider an improper aggravating factor—that defendant might illegally re-enter the United States after deportation—in determining the sentence for aggravated battery. Affirmed.

¶ 2    Following a bench trial, defendant, Juan Guajardo, was convicted of second-degree murder (720 ILCS 5/9-2(a)(2) (West 2014)) and aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2014)) and sentenced to consecutive terms of 11 years' and 5 years' imprisonment, respectively. The trial court denied defendant's motions for a new trial and to reconsider the sentence.

Defendant appeals, arguing that: (1) the evidence was not sufficient to establish that he was guilty of second-degree murder due to imperfect self-defense; and (2) the trial court considered an improper aggravating factor—that defendant might illegally re-enter the United States after deportation—in determining the sentence for aggravated battery. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On June 21, 2014, at about 2 a.m., after a night of heavy drinking and cocaine use, brothers Manny Alanis Hernandez and Ignacio Alanis Hernandez drove to defendant's (their cousin's) home at 634 North Lewis Avenue in Waukegan. For several months, Manny had lived there with defendant. Once at the house, an altercation occurred between the three men, during which Manny and Ignacio each received a stab wound. Manny died from his injury. On the night of the incident, defendant weighed about 170 to 175 pounds. He was 5 feet, 11 inches tall. Defendant had consumed about 10 beers over the prior nine hours.

¶ 5     At trial, defendant raised the affirmative defense of self-defense.

¶ 6                                 A. State's Case-in-Chief

¶ 7                                   1. Police Testimony

¶ 8     Police officers who responded to the scene based on several 911 calls, including one from defendant, found Manny, shirtless, lying on the driveway near the street and with a stab wound to his abdomen. He was "in obvious agony," according to Waukegan police officer Constantine Tzavaras. Ignacio and defendant were by Ignacio's SUV in the driveway. Officer Tzavaras smelled the odor of alcohol on defendant's breath, but defendant did not slur his speech. Officer Tzavaras also observed blood on defendant's shirt, but did not see any obvious injuries. When he arrived, Ignacio was in his SUV and defendant was standing outside by the driver's side door. Manny and Ignacio were taken to the hospital, and defendant was transported to the police station.

¶ 9    Waukegan police officer Kevin Lytle testified that defendant's clothes were cleaner and more orderly than Ignacio's or Manny's clothes.  There was lighting on the side of the house, but it was darker back toward the SUV.  Lytle also observed signs of struggle, including numerous broken beer bottles on the ground, a knocked over grill with ash spread over the driveway, blood stains near the white SUV and down its side, and blood inside the SUV on the driver's seat and area.

¶ 10    Defendant gave his first version of the incident to Waukegan police officer Cesar Garcia.  Garcia testified that, en route to the police station, defendant stated that he had gone to pick up his wife and son at the airport.  When he arrived at his house, which he shared with Manny, Ignacio was at the house.  Ignacio asked defendant where Manny was, and defendant responded that he did not know.  Manny later arrived, and defendant stated that he left around 8 p.m. to go see his wife and son.  Defendant returned home around 11 p.m. and saw Manny and Ignacio outside, drinking.  Defendant went inside to the bathroom.  While in the bathroom, defendant heard a noise that sounded like the grill falling and then heard a second noise.  He ran outside and saw Manny and Ignacio on the ground.  He denied hearing any argument prior to exiting the house and explained that traffic blocked outside noises.  Defendant told officer Garcia that he got blood on his shirt after holding Manny when he went outside.  Garcia did not observe anything unusual about defendant's head or injuries on his arms or cuts on defendant's hands.  Defendant had only blood stains on his hands.

¶ 11    Waukegan police officer Anthony Paulsen testified that he was an evidence technician at the scene.  There were bloodstains on the driveway in various locations and blood on the driver's side of the white Ford Expedition SUV.  Searching the yard behind the crime scene, Paulsen located a black-handled serrated steak knife (at 635 Westmoreland, the house directly behind

defendant's home). Officer Paulsen went to Condell hospital, where he saw Ignacio after surgery. Ignacio had bruising on the right side of his face and swelling to his right eye. He also sustained a cut on his left hand.

¶ 12     Waukegan police detective Enrique Cardenas testified that he was at Vista East Hospital in Waukegan and saw Manny's body. Manny had minor cuts on the inside of his right ring finger and right middle finger. Next, Cardenas, along with detective Grzeda, interviewed defendant at the Waukegan police department. Defendant was *Mirandized*. Per defendant's instruction, the interview was conducted in English. Defendant stated that he had been living with Manny for seven or eight months. Addressing the incident, he stated that had had some beers, came home to use the bathroom, and found Manny laying outside, along with Ignacio. Defendant had picked up his ex-wife and son from O'Hare Airport, dropped them off at a relative's house, and, between 6 and 7 p.m., returned to his home. He first saw Ignacio in the driveway. Ignacio had been at the house on prior occasions. Defendant stated that he allowed Ignacio into the kitchen to wait while defendant showered. After he showered, defendant walked to the kitchen and saw Ignacio there with Manny, drinking beers. They offered defendant a beer, but defendant refused, because he had a family gathering to attend. According to defendant, at about 11 p.m., Manny called him, inviting him to the Grand Tequila Bar in Waukegan. Defendant accepted the invitation. At the bar, he had some drinks with Manny and Ignacio and then went home. At home, he went upstairs to the bathroom and came down and saw Manny and Ignacio lying on the ground. Cardenas further related that defendant stated that he touched Manny, who was struggling to breathe. When informed that neighbors had stated that they had heard yelling and arguing, defendant denied hearing any such noises while in the bathroom. He conceded that he had been in fights at the bar, but claimed there were no fights between Manny and Ignacio.

¶ 13    Cardenas further testified that, during the interview, he did not observe any injuries on defendant. His arms were exposed, but he saw no injuries, bruising, or scratches anywhere on defendant. Nor did defendant ask for doctors to come look at him or exhibit that he was in pain. Defendant's shirt had a significant amount of blood on the chest area. When asked about the shirt, defendant stated that it was from Manny. Cardenas challenged defendant on this statement, because, at the scene, it did not appear that Manny had significantly bled enough for there to be much blood on defendant's shirt. As to Ignacio, Cardenas stated that he was bleeding more than Manny. Defendant ultimately stated that he grabbed Ignacio and that is how he got blood on him.

¶ 14    Detective Cardenas asked defendant about a knife found at the scene and if his fingerprints might be found on it, and defendant responded that Ignacio had handed it to him, defendant grabbed it, and he tossed it over the fence. He described the knife as similar to the one that was inside his house, *i.e.*, a black kitchen knife. When shown a photograph of the knife recovered from the scene, defendant advised that it was the knife he had tossed. Defendant wrote on the photograph that it was the knife that could have his fingerprints on it, and he signed it (" 'This the knife that I put my hands on it [*sic*].' ") Video was played of the interview and the taking of defendant's clothes. During the strip search, Cardenas saw no injuries or blood on defendant's chest, shoulders, stomach area, or legs.

¶ 15    After he interviewed defendant, Cardenas and detective Ulloa went to Condell to speak with Ignacio. On June 21, 2014, at about 9:45 p.m., Cardenas and Ulloa again interviewed defendant. Defendant gave his second significant version of the incident to Ulloa.

¶ 16    Waukegan detective Andrew Ulloa testified that he participated with Cardenas in their interview of defendant. (The video was played for the court.) At the beginning of the interview, as related by Ulloa, defendant is dressed in a paper suit. Ulloa told defendant that he had met with

various individuals, including Ignacio, Manny, and a neighbor. (Ulloa had actually met with Ignacio, but not with Manny or the neighbor. He used this strategy to attempt to obtain an accurate story from defendant.) During the interview, Ulloa told defendant what the other individuals allegedly said. Defendant described a struggle, however, there were no visible cuts or scrapes on his body. During the interview, defendant stated that Manny was in the house, throwing things around. Manny wanted to hurt someone that night, and that person was defendant. According to defendant, Manny yelled at him about being a bad boss. Manny started kicking things around the yard and inside the house. Defendant further related that Manny was yelling very loudly outside at defendant, and defendant asked him to be quiet so that the neighbors would not be awakened. At this point, Manny started fist-fighting defendant, and he and Ignacio came at him or were jumping him. At some point, defendant told Ulloa that he took a knife off the grill and defended himself with it. After he stabbed Manny and perhaps stabbed Ignacio (he did not know whether or not he stabbed Ignacio), defendant called 911.

¶ 17 Waukegan police officer Jeff Ferdina described the photographs of the Ford Expedition. He stated that they depicted blood running down the side of the driver's seat and a folding knife underneath the front seat. A photo also depicted blood drops on the floor by the driver's door. Photos also depicted blood going down the side of the seat and individual drops below each stream on the carpet and on the folding knife. The knife was folded closed.

¶ 18                                    2. Videotaped Statement

¶ 19 The State played two portions of defendant's videotaped statements to police. During the first portion, defendant changed out of his clothing and into a jumpsuit. Detective Cardenas, as noted, testified that he did not see any scratches, bleeding, or bruising on defendant while defendant changed his clothes.

¶ 20    In the second portion of the video, detective Ulloa interviewed defendant (beginning at 9:45 p.m. on June 21). Defendant admitted that he originally gave police a false name of "Jose Guarjardo." Defendant also stated that, as soon as the men returned to the house, Manny came at him and yelled that defendant was an asshole at work. Manny threw over a grill and trash can and went inside the house. When Manny came back out of the house, he was screaming. He went at defendant again, punching him on the head and choking him. Defendant stated that he almost passed out. Ignacio first acted as peacekeeper and separated Manny from defendant. However, Ignacio then said, "fuck it, let's fuck him up," and both men came at defendant.

¶ 21    Defendant also told Ulloa that he was running backwards and telling the men that he did not want to fight. Defendant grabbed a steak knife off the grill, one man was choking him, and the other was punching him in the head. He did not remember how the men got stabbed. Defendant did not know how Ignacio got stabbed or who was stabbed first. He was just swinging the knife (the one he threw over the fence). Defendant was afraid his cousins were going to kill him. He called 911 after he realized that both men were stabbed. Initially, defendant did not tell police what really happened because he was nervous and still a little drunk.

¶ 22                         3. Forensic and Medical Testimony

¶ 23    Kelly Lawrence, a forensic scientist at the Northern Illinois Regional Crime Laboratory, testified as an expert in forensic DNA analysis. Lawrence concluded that the DNA profile from the folding knife's blade matched the DNA from Ignacio and that the swab from the knife blade excluded Manny.

¶ 24    Dr. Mark Witeck, a forensic pathologist, testified as an expert in forensic pathology. On June 21, 2014, at about 9:10 a.m., he performed an autopsy on Manny, age 38. Manny weighed 222 pounds and was 5 feet 7 inches tall. He had a 1¼-inch stab wound on the left side of his chest,

6 inches from the front midline. Dr. Witeck estimated the depth to be about four to six inches. There was blood in the chest cavity. The left lung was collapsed (because blood was filling the chest cavity), but the knife did not hit the lung. The knife pierced the skin, chest wall, the chest cavity, diaphragm, pancreas, splenic artery, and left kidney. The splenic artery was cut in half. When the blade entered Manny's body, there was bleeding into the chest and abdomen.

¶ 25     Dr. Witeck opined that there was no way for him to tell whether or not the knife that inflicted the injuries was a serrated knife that was about 5½ inches long. It would be consistent with such a knife, but also would be consistent with the folding knife. Dr. Witeck further testified that any sharp instrument would have caused Manny's wounds. He could not opine if the knife was driven into the body or if it was caused by the body coming into the knife.

¶ 26     Other injuries Dr. Witeck observed on Manny's body included a cut on the palm of the right hand, superficial cuts on the palm side of the right fingers, and a cut on the right wrist. A sharp instrument, such as the knife, would have caused such cutting wounds. Dr. Witeck further testified that Manny's blood alcohol concentration was .187 and that he had cocaine in his system. The cause of death, Witeck opined, was a stab wound to the chest and abdomen.

¶ 27     Dr. Scott Miller, the emergency room doctor at Condell, testified that he treated Ignacio on June 21, 2014. Ignacio had a three-inch stab wound/laceration to his lower abdominal wall. It was an external wound. Ignacio had two holes in his small intestine and a "through-and-through" hole in his large intestine. His stab wound, which was three to four inches deep, was life threatening. He underwent surgery and received a colostomy bag. Six months later, Ignacio underwent another surgery to remove a section of the large intestine and the colostomy was removed. A knife with a five-inch blade, such as the serrated kitchen knife, could have caused his stab wound.

¶ 28    The toxicology report indicated that Ignacio was positive for cocaine and alcohol. His blood serum level was .267.

¶ 29                                           4. Ignacio

¶ 30    Via an interpreter, Ignacio, age 43, testified that he is 5 feet 6 inches tall and weighs 220 pounds. Manny, his brother, lived with defendant in June 2014. Defendant is Ignacio's and Manny's cousin. In June 2014, Manny worked in construction and defendant was his boss.

¶ 31    On June 20, 2014, Ignacio and Manny went to the Grand Tequila bar in Waukegan. They drank, and Manny danced. Prior to going to the bar, the brothers drank. Ignacio had five beers. It was normal for Ignacio to have five beers in an afternoon. When he went to the bar, he was not feeling the effects of the beer. He drove his white Expedition SUV to the bar. The brothers arrived at the bar at around 11 p.m. and stayed for about 2½ to 3 hours. Ignacio drank about four or five more beers. He was still able to walk straight and have conversations, but he conceded that he was drunk. Ignacio testified that he also consumed cocaine. The cocaine was in the middle of a folded one-dollar bill. Ignacio used it two to four times to ingest the cocaine. He went to the bathroom and used a dime to pick up the cocaine. Ignacio stated that the cocaine relaxed him. He did not argue with anyone in the bar, and he denied that the cocaine made him violent or aggressive. Manny was also using cocaine that evening.

¶ 32    The brothers left the bar at about 1:30 or 2 a.m. when the bar closed. They drove to defendant's house, and Ignacio parked the SUV at the end of the driveway (in reverse). The brothers conversed inside the truck. Defendant then arrived in his truck and started yelling at Manny, asking him what he was doing there. Manny responded that he lived there. Defendant continued screaming, and Manny told him not to yell, because he yelled at Manny at work. Defendant then walked toward Ignacio and Manny. The brothers were standing in front of

Ignacio's truck. Manny walked toward the house and became very angry. He threw over a grill. It made a mess. Manny then walked toward North Lewis and was there for about five or six minutes. Defendant was on the phone. Ignacio stood by his truck.

¶ 33    Manny returned from the street, defendant went toward him, and they started yelling, insulting each other. "[W]hy are you yelling at me? Don't yell at me anymore. No, we're not at work." Defendant pushed down Manny. Defendant went up to Manny a second time, while bending at the waist with the top of his head pointing at Manny's stomach. Manny grabbed defendant and held him. He did not hit him. Defendant punched Manny, and Manny told defendant not to scream at him anymore. They both yelled at each other. This occurred for about 2½ to 3 minutes.

¶ 34    Ignacio approached the men and tried to pull them away from each other. Ignacio felt a punch on his stomach. Defendant punched him, but Ignacio did not see anything in defendant's hands. He walked to his truck and tried to turn it on (he did not enter the vehicle). The vehicle did not start. Ignacio opened the door and saw the police arrive. He closed the door and walked toward the house. A police officer instructed him to come over and another officer instructed defendant, who was in front of the house by Lewis, to come over.

¶ 35    The officer instructed Ignacio to lie down, and he complied. Ignacio was bleeding through his clothing. There was a lot of blood. He did not see blood when he had gone to his truck earlier. After a while, Ignacio felt very weak. He saw defendant on his cell phone. An ambulance transported Ignacio to the hospital.

¶ 36    While in the hospital, police officers came to speak to Ignacio. He was in pain at the time. Ignacio identified photographs taken of him at the hospital. They depicted injuries to the area above his right eye, on his finger, and stomach.

¶ 37    Ignacio never said anything to Manny during the altercation, nor did he ever threaten defendant or punch or strike him. He denied saying " 'fuck it, let's get him.' " In the past, he had a physical fight with defendant. Ignacio further testified that, in June 2014, he owned a switchblade knife that he used for work. He worked on irrigation systems. Ignacio had the knife with him on his person the evening the brothers went to the bar. However, he did not take it into the bar, because there was a security guard present. Ignacio placed the knife under the seat of his truck before entering the bar. After the brothers returned to defendant's house, Ignacio did not retrieve the knife to put it back on his belt. At no point that evening did he retrieve the knife. He identified a photograph depicting his folded knife under the driver's side seat of the SUV, with part of the knife, which was on the carpet, protruding from under the side of the driver's seat. The photograph also showed drops of blood on the knife (and surrounding carpet) and streaks of dried blood on the side of the seat in the area over the knife. Addressing the blood on his car seat, Ignacio testified that it was his own.

¶ 38    On cross-examination, Ignacio testified that, when he and Manny left the bar, they bought a 24-pack of beer. They planned on going to defendant's house and drinking more beer. Ignacio denied that defendant was with him and Manny at the bar for a while. He also denied that Manny called defendant to invite him to meet them at the bar.

¶ 39    When asked how his blood got on the blade of his folding knife, Ignacio replied that it occurred while he tried to start his vehicle (and presumably dripped off of him). Defendant was on his cell phone at first and after he and Manny got into the altercation. Manny was angry at defendant for reprimanding him at work. Defendant stated to Manny that he wanted Manny to work a little faster. Ignacio denied that Manny went into the house at one point and started

throwing things out of the refrigerator or throwing things in the house. Ignacio did not see anyone do such things, and he did not see Manny or defendant go inside the house.

¶ 40    Ignacio did not see a recycling garbage can get knocked over. There were some beer bottles on the grass. One day earlier, there was a barbeque at the house, and it was possible that this was when the garbage can was knocked over.

¶ 41    Ignacio conceded that he told police on June 21, 2014, that Manny and defendant were arguing, because Manny claimed that defendant was reprimanding him at work and it was not necessary for him to get reprimanded and Manny was very angry. At trial, he stated that defendant arrived home and yelled at Manny, asking him what he was doing at the house.

¶ 42    When Ignacio tried to separate Manny and defendant during the fight, Ignacio was hit on the side of his face. He did not know who hit him. Defendant was punching during the altercation. Manny put defendant in a hold, and Manny was 220 pounds. Manny held defendant with both arms wrapped around him. He held him so tightly that Ignacio had trouble separating the men. Manny was angry.

¶ 43    In June 2014, at the hospital, Ignacio told the police that Manny got really mad, went where the grill was, knocked it down, and came where the tree was and stood in front. That is when they started fighting. Ignacio also told the police that day that he did not know when he got hit in the stomach.

¶ 44    After defendant pushed Manny, they were three feet apart. Defendant bent over, and they went at each other. Manny held defendant and never hit him.

¶ 45    The State rested. The trial court denied defendant's motion for a directed finding.

¶ 46                    B. Defendant's Case-in-Chief

¶ 47                    1. Thomas Theis - Neighbor

¶ 48     Thomas Theis, a neighbor at 642 North Lewis in Waukegan, testified that, at about 2 a.m., he awoke to the sound of loud yelling and breaking bottles. He listened to the yelling for a couple of minutes. It escalated, and, when the bottles broke, he called 911. During the call, he looked out the window and saw three silhouettes moving back and forth in the driveway. He did not see any objects. He heard bottles being broken in the driveway. At one point, he saw a man go into the house and throw things out of the refrigerator and out of the house.

¶ 49     Theis prepared a written statement on June 21, 2014. He wrote that there were glass bottles broken in the driveway. He also told police (Office Simoncelli) that there were two subjects holding a third subject. At trial, he testified that he was not confident that that was what occurred. He conceded that the events were fresher in his mind when he gave his statement than they were three years later during trial. Addressing the three subjects he saw, Theis stated that one wore no shirt, another wore a turquoise shirt and was standing near an SUV at the end of the driveway, and the third person wore dark clothing and stood by the house. Earlier, Theis saw a man in the house, angrily throwing food out of the refrigerator.

¶ 50     On cross-examination, Theis testified that he had gone to bed around 11:30 p.m. At about 2:30 or 2:45 a.m., he heard male voices yelling in Spanish. It went on for several minutes and was not de-escalating. Next, bottles started to break, and he called 911. The weather that evening was clear, and Theis's bedroom window was open. He was able to see shadows and figures out his window, but not "any individual details of people," such as faces. There was no exterior light on at the property, just incident light from the road. Theis could not see what the three men were doing with their arms or legs. They moved all along the driveway area.

¶ 51     After he called the police, Theis went back to bed. However, before the police arrived, Theis received a call from police, asking if he had called about a stabbing. Theis explained that

he had called about the noise. Shortly after that, the police arrived and lit the scene. Theis saw the shirtless man on the ground, the man in the turquoise shirt by the truck, and the third man (in a black shirt, perhaps) walking around and being told to put his hands against the wall.

¶ 52     There is an empty lot between Theis's property and defendant's home, about 50 to 60 feet wide. Theis gave his statement at the police station at about 5 a.m. In his written statement, he did not state he observed two subjects holding a third subject. Theis could not see if the men were striking blows on a third person or if one of them was breaking up a fight.

¶ 53                              2. Officer John Simoncelli

¶ 54     Waukegan police officer John Simoncelli testified that he canvassed the neighborhood on the 600 block of North Lewis, looking for witnesses to a possible stabbing. He interviewed Theis, and Theis stated that he noticed two of the subjects holding a third subject. On cross, Simoncelli testified that he questioned Theis at Theis's front door for a few minutes. He did not ask for a written statement.

¶ 55                                    3. Defendant

¶ 56     Next, defendant testified on his own behalf. In June 2014, defendant lived at 634 North Lewis in Waukegan. On June 20, 2014, at mid-afternoon, defendant was at work at Navy Pier in Chicago. He was remodeling, doing most of the concrete work at the Pier. Defendant was in charge of all the concrete work. He is a carpenter foreman and runs work for companies. At that time, he worked for CSI 3000 in Chicago. He chose his crew and chose Manny to be on his crew, because Manny was a good worker. Defendant earned about $50 per hour.

¶ 57     After work, defendant went to O'Hare Airport to pick up his ex-wife and son, who were visiting from Texas. On the next day, a Saturday, his son's cousin was having a quinceanera (*i.e.*, a "Sweet 16" party), and they were going to attend.

¶ 58    Defendant picked up his ex-wife and son around 3:30 p.m. and took them to his ex-wife's brother's house in Waukegan. They arrived at 5 p.m., and defendant stayed there until 7 p.m. Defendant went home to shower, intending to return to see his ex-wife and son. When defendant arrived home, he pulled into the driveway and noticed Ignacio at the back of the driveway in the SUV. He was drinking by himself. Ignacio asked about Manny, and defendant replied that he did not know where he was. (Manny did not have a driver's license or a cell phone.) Ignacio drank beers in the SUV. Ignacio offered defendant a beer, but defendant explained that he had to shower and hurry back to his family. Defendant let Ignacio in the house and went to take a shower.

¶ 59    After he showered, defendant returned downstairs and saw Manny and Ignacio in the kitchen. They were drinking and offered defendant a beer. Defendant declined and left.

¶ 60    Later that evening, Manny called defendant on Ignacio's cell phone, inviting defendant to join them at the Grand Tequila bar. Defendant did not commit to joining them, because he had plans with his son the following day. However, on the way home, at 11 p.m., defendant stopped at the bar. He spent the next three hours there with his cousins. (Between 5 p.m. and 2 a.m., defendant drank about 10 beers.) After he left the bar, defendant went home and parked his car next to his work truck in the driveway. Soon afterwards, Manny and Ignacio arrived, and Ignacio parked his SUV all the way in the driveway. (The driveway is on the north side of the house and wraps around the back of the house.) When he arrived home (the bar is two minutes from his house), there were no broken bottles in the driveway or litter thrown about the area.

¶ 61    Defendant exited his truck. It was about 2 a.m. He testified that he tried to talk to Manny, "and Man[ny] out of nowhere—Ignacio was still in the truck. Man[ny] out of nowhere, he punched me in the chest, and he knocked me down." Defendant did not understand why Manny hit him. He asked Manny what happened and why are you doing this. Defendant got up. He was right in

front of Manny and asked why he hit him. Manny did not answer, took off his shirt, and flexed his arms like a body builder. Defendant kept asking what was going on. The men were two to three feet apart. Ignacio was outside the SUV at this time, standing next to it and close to defendant. He was silent.

¶ 62    Manny was "pretty mad," screaming at defendant, and "saying that he was going to fuck me up" (in Spanish). According to defendant, he had not done anything to Manny that night. He asked Manny to calm down and hold down the noise. Defendant was concerned that the neighbors would wake up and call the police.

¶ 63    Manny came at defendant with his fist and started swinging at him, punching defendant. He knocked down defendant. Manny continued punching defendant while defendant was on the ground, and defendant blocked most of them. He asked Manny to stop, but Manny continued screaming and telling defendant "that he was going to fuck me up and then just swinging at me." Manny was landing punches, hitting defendant's arms, shoulders, and the side of his face. Defendant testified that he sustained facial bruising on his right side and redness on his neck. Defendant also sustained bumps or welts as a result of Manny punching him on the head.

¶ 64    Defendant got Manny off of him. He could not recall if Ignacio got involved. Defendant stood behind his truck, and Manny "got all crazy." Manny, according to defendant, kicked over a trash can and "smashed it all over." There was garbage strewn all over. Manny went into the house, opened the refrigerator, and threw food all over the kitchen. (There were no blinds on the kitchen window.) Manny went outside, and defendant asked why he was so mad. Manny replied, "cause you're an asshole" and that defendant yelled at him at work. Defendant denied that he yelled at Manny, stating that Manny was his "best guy" on the crew. "That's why I always liked to have him around." Defendant hired Manny and had the ability to fire him.

¶ 65    Manny left the house and picked up a grill that was on the driveway and smashed it on the driveway. It made a mess and a lot of noise. Manny threw around the recycling can. Defendant identified photographs that depicted two beer cans on his driveway that evening. He also identified photographs of bottles, ashes, garbage and a recycling can, noting that Manny littered the driveway with the items.

¶ 66    At some point, Manny again came into physical contact with defendant. He knocked down defendant. While defendant was on the ground, Manny tried to hit defendant. Defendant moved around, trying to get off of Manny. However, Manny put defendant in a headlock with his right arm and choked him. Defendant could not breathe and thought he was going to pass out. He asked Ignacio to get Manny off of him. Ignacio complied, got in between Manny and defendant, and pulled Manny off of defendant. "When he got off of me, he pushed him. There's [*sic*] like away from me." Defendant got up and asked his cousins to leave. "I said both of you guys got to get out of the house." Manny "got worse." He was angrier, and Ignacio "also turned." They were very mad, "like they were going to kick my butt, like they were going to fuck me up." Defendant was "scared" and "terrified" of them and feared for his life. He looked back, and there was a second grill with a chopping board to the side with a serrated kitchen knife. Defendant grabbed the knife.

¶ 67    Defendant walked backwards on the driveway from his cousins. He denied that he bent over at the waist and walked into Manny. As he was backing away toward North Lewis, Manny and Ignacio walked toward defendant "trying to get me." Defendant was scared. The men reached defendant, one of them held defendant by one of his arms and the other man was on his other side. Both men swung at defendant. He tried to block the punches and had the knife in his hand. They held defendant and swung at him.

¶ 68    Defendant further testified that he swung the knife from underneath, and Ignacio backed away.  "I didn't know if I did hit him or not."  Defendant did not intend to stab Ignacio or plunge a knife in his belly.  He was trying to walk away from his cousins.  Defendant did not know that he had wounded Ignacio.  He did not intend to kill him or knowingly cause him bodily harm.

¶ 69    After Ignacio walked away, Manny, in front of defendant, grabbed defendant in a bear hug.  Defendant does not know if he plunged the knife into Manny or if Manny came into the knife when Manny came at him.  Defendant did not intend to kill Manny.  Defendant was scared and "couldn't think clear."  "I thought totally they were going to kill me or something."

¶ 70    Later that day, defendant spoke to the police.  Initially, he did not tell the truth, because he was scared.  Defendant is not legally residing in the United States.  He worked under the name "Jose Guajardo."  The Department of Homeland Security had removed defendant from the United States and sent him back to Mexico as "Juan Guajardo."  Defendant re-entered the country without documents.

¶ 71    On cross-examination, defendant testified that, while he walked backwards, both cousins screamed at him.  Manny stated, repeatedly, that he was going to fuck defendant up, and Ignacio stated that they were going to hurt defendant.  Defendant told them to back off, holding out his left hand.  (The serrated knife was in his right hand.)  At the northeast corner of the house, the men caught up to defendant and they both swung punches at him.  Defendant tried to block them with his arms outstretched and moved around.  He kept the 220-pound and 210-pound cousins close to his head and exposed his forearms to them.  This went on for a few seconds.  Defendant repeatedly asked Manny and Ignacio to back away, but they did not.  "So I swung the knife" from underneath and lowered his other hand.  Both men faced him.  Manny was on the left, and Ignacio was on the right.  Defendant believes he swung "twice or so" at Ignacio, close to the abdomen.  Ignacio was

punching defendant at this time. Ignacio backed off after defendant stabbed him. Defendant stated that he was defending himself. Ignacio walked away. "[Y]ou can't fight against two guys, each of them are 50 pounds heavier than you."

¶ 72    Manny grabbed defendant in a bear hug while facing him, and hugged defendant's upper arms. Defendant was belly to belly with Manny. Defendant could breathe. They fell down ("He knocked me down"), and Manny landed on top of defendant, his arms still around defendant. "[T]hat's when he got stabbed." Manny fell on the knife. "I don't know if it was an accident because he was trying to hurt me." Defendant pulled out the knife and threw it away.

¶ 73    Manny earned about $40 per hour. He lived with defendant for about seven or eight months. Defendant never had any issues with Manny prior to the incident. Defendant had no intention to hurt anyone. Manny was like his brother. "We were always together. We grew up together."

¶ 74    Defendant conceded that he gave police different versions of the events, explaining that he was scared, because he used a different name and had been removed from the United States in the past. He could not give police his real name. When asked again whether he told the first officer that someone came over and, when defendant exited the house, they were already injured, he replied that he did not recall saying that. He conceded that he told police that, when he exited the house, Ignacio gave him a knife and told him to throw it over the fence. At trial, he stated that this is not what occurred. "I did because I was just so scared, but I ended up telling the truth." He conceded that he told Officer Cardenas the story about throwing the knife over the fence only after the officer asked if there was any reason why defendant's fingerprints were on the knife.

¶ 75    Defendant also conceded that, on the day of the incident, he did not tell police that Manny fell on the knife. He told Officer Garcia that, when he came out of his house, there was no one

- 19 -

outside and that maybe someone stabbed Manny or maybe he stabbed himself. When he called 911, defendant stated that two people were stabbed. He could not recall if he gave the operator their names.

¶ 76    Defendant identified the blue jeans he wore that night, noting marks on the rear pockets and on the legs, where he was knocked to the ground. Defendant also identified the shirt he wore on the night of the incident (the one he wore after he showered), noting the dirt along the back of the shirt. Defendant stated that the dirt was from where he was knocked to the ground.

¶ 77    When asked why he did not point out any bruises when he undressed at the police station, defendant stated that he was only asked to point out his tattoos. "I had bruises all over." Defendant also stated that he had "punches" and that one does not necessarily have to have bruises from the punches. He stated that his neck was red and his right eye was swollen. Defendant did not require stitches. This was not the first physical fight defendant had been in with Ignacio.

¶ 78    The second version of events, which defendant related to Ulloa, was that this was simply an argument about work. Manny had him on the ground, choking defendant, and that defendant almost passed out. Ignacio got between them and separated the men. He had asked Ignacio to help, because defendant could not breathe. He clarified, when asked how he could speak to Ignacio, that he had trouble breathing, not that he could not breathe. Defendant felt dizzy. He also told Ulloa that Ignacio had a knife that he normally kept in his belt. Defendant stated to the officer that he did not remember how they got stabbed. He also stated that the three men did not fight at the bar and that Manny first called defendant an asshole at work. Defendant told Ulloa that he stated to Manny, why don't you wait until you are drunk to talk about these kinds of things? He also told him that he was a responsible person; if things went wrong with the boss at work, the boss would come after defendant, not Manny. At trial, defendant stated that it was not merely an

argument. Manny was aggressive. Defendant told Ulloa that Manny came straight at him. He conceded that he did not tell Ulloa that the first thing that happened after the men returned to defendant's home from the bar was that Manny got out unprovoked and punched defendant in the chest and knocked him to the ground. Defendant estimated that he had about four or five beers in a three-hour period while at the bar.

¶ 79   On re-direct examination, defendant testified that he did not know that he had stabbed Ignacio, and he did not intend to do so. While being choked, defendant feared for his life, and continued to fear for his life as Ignacio and Manny followed him and backed down the driveway and when they came at defendant the third or fourth time at the end of the driveway. Defendant testified that he told Ulloa that Manny came at him and that he was very angry and called him names. Defendant also asserted that he told Ulloa that Manny choked him and yelled at him about being a bad boss. He also stated that he told Ulloa that Manny started the fist fight, kicked things around the yard and in the house, and that Ignacio also came at him. Defendant also asserted that the told Ulloa that he grabbed the knife that was on one of the grills to defend himself.

¶ 80   On re-cross examination, defendant conceded that Ignacio never stated that he was going to kill defendant. That evening, defendant saw the knife pouch that Ignacio carries on his belt. Defendant did not see the knife in the pouch. When asked why, if Manny was being more aggressive, defendant twice stabbed Ignacio, defendant replied that "he also turned," got mad at defendant, and attacked him. He did not tell Ulloa that he was backing off away from them, but that is what actually happened.

¶ 81           4. James O'Donnell – Pharmacologist and Pharmacist

¶ 82   James O'Donnell, a pharmacologist and a licensed registered pharmacist, testified that Manny had very high levels of pure cocaine in his blood (300 nanograms per milliliter) and it was

recently consumed. He also had alcohol of .187 grams per deciliter. His alcohol intoxication was significant in a naïve person and, in a chronic active alcoholic with tolerance, it was still impairing. O'Donnell opined that Manny was impaired.

¶ 83    Manny was "significantly intoxicated and impaired by the combination of cocaine and alcohol and that impairment or intoxication resulted in aggressive behavior, increased tendency to violence, lack of judgment, loss of inhibitions, increased risk-taking and that type of behavior is particularly associated with what's known as a substance use behavior disorder." He further testified that the behavior was primarily cocaine-induced aggressiveness.

¶ 84    Addressing Ignacio's .267 level of intoxication, O'Donnell opined that he had a greater level of intoxication. He would advise someone with that level not to operate a motor vehicle.

¶ 85    Someone in Manny's state would display highly aggressive, intoxicated, out-of-control behavior. That is consistent with cocaine agitation and aggression that is consistent with defendant's description of Manny's behavior.

¶ 86    In the literature of O'Donnell's field, cocaine is known to cause severe aggressive intoxication, although not in the overwhelming population of cocaine users. It carries a separate diagnosis of cocaine-induced psychosis. "Aggression and violence is on the way to psychosis." Cocaine-induced psychosis is when an individual loses touch with reality, loses control, and displays aggressive behavior and significant risk-taking. For example, people jump off bridges or attack people without reason. (Cocaine is the third most popular illicit drug in the country.)

¶ 87    O'Donnell opined that Manny was intoxicated by cocaine and alcohol at the time of the altercation and that he was in a cocaine-induced psycho-active induced behavior state when he assaulted defendant.

¶ 88    On cross-examination, O'Donnell testified that alcohol and cocaine will affect different people in different ways. Even a regular or binge drinker who has a .187 level may be totally functioning, but he or she has disinhibition. The person has impairments in the brain.

¶ 89    O'Donnell reviewed the documentary evidence in this case and interviewed defendant (in November 2016). He also interviewed Juan Medina, who knew all three parties. Medina knew the parties for several years and provided background information about defendant's and Manny's relationship and of how Manny acted when he was drunk and using drugs. He was a collaborative source. Medina described Manny, when using cocaine and alcohol, as aggressive and initiating trouble. A "wild bull." However, he did not describe any physical violence.

¶ 90    The trial court admitted a page from an emergency order of protection obtained by Manny's wife in 2012. The order stated that Manny threatened to kill his wife if she re-married, told her that he was going to blow her up in her truck, and broke a door to one of the bedrooms.

¶ 91              C. Trial Court's Ruling and Subsequent Proceedings

¶ 92    On May 25, 2017, the trial court found defendant guilty of second-degree murder of Manny and aggravated battery of Ignacio. It noted that "all three of the main actors drank around a dozen beers, ingested substances that to various degrees impaired their judgment." In assessing self-defense, the trial court noted that it considered whether defendant was the initial aggressor who actually believed a danger existed that required the use of force applied, and whether his use of such force was objectively reasonable in the context of the case. The court found as follows. When the three men arrived at defendant's house, defendant and Manny had a verbal argument. It was unclear who started it, but, "ultimately, the answer to that question does not matter." Neither one was armed at that point, and they engaged in "classic mutual combat, as the law calls it, between two intoxicated men." It ended when they separated. The court further noted that

defendant's testimony was that Manny started fighting, then, went inside, and the fight stopped. Later, the three men were outside on the driveway again and Manny, according to defendant, choked him and they separated again. Defendant testified that he was scared and, so, grabbed the knife. The court found that it was notable that defendant did not leave, walk away, go to his car, or call for help. "Instead, he [ ] escalated the situation" by introducing a deadly weapon. "[H]e brings a knife to a fist fight." The court further noted defendant's testimony that the men again re-engaged and that Manny and Ignacio held him back. Defendant insisted he had his arms up to protect his face and head, all the while holding the knife, "which, therefore, would have meant the knife was inches from his own face." Defendant then stated that he swung the knife from underneath and must have stabbed Ignacio without realizing it.

¶ 93    The trial court determined that the physical evidence did not support this claim. Photographs, according to the court, clearly showed injuries to Ignacio's face and head, but defendant did not sustain injuries to his face, chest, or arms. "Both his booking photo as well as the video images of him at the police station taking off his shirt and his pants demonstrate this."

¶ 94    Addressing Ignacio's pocket folding knife, found in his vehicle, and defendant's argument that Ignacio had it during the confrontation or that defendant believed he had it, the trial court found that there was "no credible evidence that Ignacio did have it with him, never mind actually h[e]ld it or use[d] it against the defendant. So there's only one knife that's really involved in the case here."

¶ 95    Next, the court addressed defendant's testimony that Manny had him in a bear hug and that defendant stabbed him to get away. The court found that there were several issues with this testimony. First, it did not constitute application of deadly force by Manny against defendant, and defendant stabbing Manny to get away, the court further found, was disproportionate and

excessive. Further, Manny had small wounds on his hand that appeared consistent with defensive injuries, according to the court, while defendant did not appear to be injured. Defendant's "excessive force and disproportionate use of force is the primary concern here."

¶ 96 The trial court further found that neither defendant, nor Ignacio, had a perfect memory of what happened, aside from their obvious biases. Defendant's mental process, like Manny's and Ignacio's, was affected, the court found, "by at least the drinking; never mind the excitement of the moment." The evidence suggested that "defendant did actually think he needed to defend himself, even if that belief was, at least in part, fueled by alcohol. But in the end, the Court does find beyond a reasonable doubt that, at a minimum, the use of force by defendant against both [Manny] and Ignacio was not objectively reasonable."

¶ 97 The court cited several cases, including *People v. Jeffries*, 164 Ill. 2d 104 (1995), *People v. Holman*, 2014 IL App (3d) 120905, *People v. Moore*, 343 Ill. App. 3d 331 (2003), and *People v. White*, 293 Ill. App. 3d 335 (1997). Citing *White*, the court noted that it involved mutual combat, where the parties fought willingly upon equal terms and the court concluded that imperfect self-defense was not, therefore, available in that case. Citing *Holman*, the trial court noted that it instructed that the right to self-defense is not available for acts of revenge or retaliation and does not allow for excessive force, which is an act of retaliation and renders the defendant the aggressor even if the other person started the confrontation.

¶ 98 The trial court also addressed the nature of the injuries in this case, finding that defendant did not inflict "glancing blows" on Manny and Ignacio, but "essentially impaled" the men with a knife. "A person doing so knows the natural and probable results of such conduct. But that is a different thing than stabbing someone with the specific intent that you want them to die from the stabbing."

¶ 99    Accordingly, the trial court found that the State had proved the elements of murder beyond a reasonable doubt, including disproving self-defense. The court also determined that the evidence showed that defendant subjectively believed, although unreasonably, that he was acting in self-defense. The court found him guilty of second-degree murder of Manny and guilty of aggravated battery of Ignacio.

¶ 100    On June 20, 2017, defendant moved for a new trial, arguing that the trial court misunderstood applicable law in finding that a single stab wound was disproportionate and excessive, labored under the mistaken belief that defendant had a duty to retreat, and found that defendant drank beer and ingested substances to various degrees, impairing his judgment. At the hearing on the motion, the trial court commented that there was no direct evidence that defendant had ingested cocaine.

> "The Court was simply lumping that chunk of time together, if you will. And the import of those comments were that all three of them in each their own way through the alcohol had consumed what used to be more commonly called intoxicating beverages, and that could have affected their perception of a number of things. The Court was not suggesting that the defendant was high on cocaine specifically. In fact, perusal of the PSI shows that it is not his drug of choice by any stretch of the imagination."

The trial court denied defendant's motion for a new trial.

¶ 101    The pre-sentence investigation report revealed that defendant originally entered the United States with his parents, in 1995, on a vacation visa, but did not return home to Mexico. In 2001, he pleaded guilty to manufacture/delivery of cannabis and was sentenced to four years' imprisonment. He completed his sentence in 2004 and was deported to Mexico. Defendant subsequently re-entered the United States, and, in 2009, he was sentenced to 40 months in federal

prison for illegal re-entry after deportation. After serving that sentence, defendant was deported to Mexico in 2012. In 2014, he was arrested in the instant case, and an immigration retainer was issued on June 23, 2014. On December 18, 2014, a probation violation was filed, and a full extradition warrant issued. There was a hold for defendant in the Lake County jail at the time of the pre-sentence report. Defendant worked as a carpentry foreman for CSI 3000. The company's chief financial officer submitted a form, describing defendant as a hard worker and satisfactory employee.

¶ 102 At the sentencing hearing, the court admitted several victim-impact statements, including from Ignacio and Jaime Contreras, Manny's father.

¶ 103 The trial court sentenced defendant to 11 years' imprisonment (plus two years mandatory supervised release) on the second-degree murder conviction and 5 years' imprisonment (plus two years mandatory supervised release) on the aggravated battery conviction, to be served consecutively. It noted that the incident was preventable and was fueled by alcohol and drugs. The court further noted that the evening had started out with promise, because defendant, age 40, was going to see his son. His ex-wife, the court acknowledged, had a lot of positive things to say about defendant and spoke warmly of him. "But beer after beer after beer after beer later, words flew, tempers flared, and I have no doubt that you regret [ ] what ended up happening, happening." The trial court noted:

> "This entire thing is a waste, should never have happened. Your fight with and stabbing of [Manny], I have already talked about and found you guilty of second-degree murder. Your stabbing of Ignacio is even less justifiable, completely unwarranted and undeserved. It was over."

¶ 104  Addressing defendant's history of delinquency or criminal activity, the court noted that defendant entered this country in 1995, overstayed his visa, worked well, served 15 months on a drug case, was removed from the country, and then returned.  The federal government prosecuted defendant for illegal re-entry, defendant served three years, and then he again returned.  In terms of deterrence, the court noted that the lesson for the community pointed to the consequences of excessive drinking.  As to any substantial grounds tending to excuse or justify the conduct, the court commented that it worked to defendant's favor.  As to whether defendant would commit another crime, the court stated:

> "I'll leave it to [defense counsel] and his crystal ball as to whether the federal government will prosecute you for again illegally reentering the United States.  I have no idea; it's not my concern.  If you owe a debt to the United States, the United States will come to you to collect it.
>
> This is the State of Illinois to whom you owe justice in the Illinois court for the crime you committed violating Illinois law, second-degree murder and aggravated battery.  But as I look to what might be your future conduct, for the last 15 plus years, every time you have been removed from the United States, you have rather quickly and quite easily come back.  I imagine in the near future, if you have the possibility to do that again, you might.  Again, that's more of a federal concern than mine."

¶ 105  The trial court noted that a significant factor in its verdict was that, immediately after the incident, defendant called 911, which "may have saved Ignacio's life."  The court also acknowledged defendant's good behavior while in jail for three years during the pendency of this case.  Defendant made good use of his time, including taking classes while in jail.

¶ 106   The court found that imprisonment, not probation, was necessary to protect the public and serve the ends of justice.  It further determined that consecutive sentences were warranted, because the offenses involved the infliction of severe bodily injury.  Even if that statutory provision did not apply, the court continued, consecutive sentences were warranted, because of the nature and circumstances of the offenses and defendant's history and character.

¶ 107   On June 22, 2017, defendant moved to reconsider the sentence.  On July 12, 2017, the trial court denied the motion, noting that the five-year sentence for aggravated battery was the maximum sentence for that offense, while the 11-year sentence for second-degree murder was below the midline of the permissible 4 to 20 years.  The court added:

> "In making the Court's findings, the Court commented, perhaps inartfully, regarding how it assessed the evidence and the statutory and nonstatutory factors in aggravation and mitigation.  The Court commented upon an argument made by counsel regarding what the federal government might do.  The Court was simply attempting to comment on the unpredictability of federal action in these areas."

¶ 108   Defendant appeals.

¶ 109                                    II. ANALYSIS

¶ 110   Defendant argues that: (1) the evidence was not sufficient to establish that he was guilty of second-degree murder due to imperfect self-defense; and (2) the trial court considered an improper factor—that defendant might illegally re-enter the United States after deportation—in determining the sentence for aggravated battery.  For the following reasons, we affirm.

¶ 111       A. Second-Degree Murder & Aggravated Battery – Sufficiency of Evidence

¶ 112   Defendant argues first that the State failed to prove beyond a reasonable doubt that he did not act in reasonable self-defense, where its case hinged on the testimony of an unreliable

witness—Ignacio—who was severely intoxicated and high on cocaine and whose memory of the incident was extremely poor. He also points to Theis's statement to police that he saw two men attacking a third man. Defendant also contends that the trial court's comments both at the end of trial and at sentencing show that the court did not properly apply the law of self-defense. Defendant requests that we vacate his convictions for second-degree murder and aggravated battery.

¶ 113 In determining the sufficiency of the evidence, a reviewing court considers whether, viewing the evidence in the light most favorable to the State, " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). On review, all reasonable inferences from the evidence are drawn in favor of the State. *Jackson*, 443 U.S. at 318-19. The reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

¶ 114 As relevant here, aggravated battery occurs where, when committing a battery, other than by discharge of a firearm, a person knowingly causes great bodily harm or permanent disability or disfigurement. 720 ILCS 5/12-3.05(a)(1) (West 2018).

¶ 115 Turning to murder, there are three types of first-degree murder in Illinois: (1) intentional murder, *i.e.*, where the defendant "intends to kill or do great bodily harm" or "knows that [his or her] acts will cause death" (720 ILCS 5/9-1(a)(1) (West 2018)); (2) strong-probability murder, *i.e.*, where the defendant knows that his or her acts "create a strong probability of death or great bodily harm" (720 ILCS 5/9-1(a)(2) (West 2018)); and (3) felony murder, *i.e.*, where the defendant

commits or attempts to commit a forcible felony and, during the commission of that felony, a death occurs (720 ILCS 5/9-1(a)(3) (West 2018)).

¶ 116    Second-degree murder occurs when the defendant commits either intentional, knowing, or strong-probability first-degree murder and one of two mitigating factors is present: (1) the defendant acted under a sudden and intense passion resulting from serious provocation by the victim (720 ILCS 5/9-2(a)(1) (West 2018)); or (2) the defendant subjectively believed that he or she was acting in self-defense, but this belief was unreasonable (720 ILCS 5/9-2(a)(2) (West 2018)).  See *People v. Jeffries*, 164 Ill. 2d 104, 122 (1995).  The second mitigating factor, which has been described as "imperfect self-defense" (*id.* at 113), is the factor at issue in this case.

¶ 117    Defendant here argues that the State failed to disprove his claim of self-defense beyond a reasonable doubt.  Self-defense is an affirmative defense.  *People v. Olaska*, 2017 IL App (2d) 150567, ¶ 143.  Thus, before self-defense is considered, the State must first prove the defendant guilty of first-degree murder.  *Jeffries*, 164 Ill. 2d at 118.  The defendant bears the burden to prove, by a preponderance of the evidence, one of the mitigating factors to reduce an offense of first-degree murder to second-degree murder.  *Jeffries*, 164 Ill. 2d at 114.  However, the State bears the burden to prove, beyond a reasonable doubt, the elements of first-degree murder, and, when appropriately raised, the absence of circumstances at the time of killing that would justify or exonerate the murder.  *Id.*

¶ 118    To rebut a claim of self-defense, the State may negate any one of the following self-defense elements: (1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he or she actually and subjectively believed a danger existed that required the use of the force applied; and (6) his or her beliefs were objectively reasonable.  *Jeffries*, 164 Ill. 2d at 127-28.  "If the State negates *any*

*one* of the self-defense elements, the defendant's claim of self-defense must fail." (Emphasis added.) *Id.* at 128. If the elements are otherwise met, but the defendant acted with an actual, though *unreasonable*, belief that his or her actions were justified, the defendant is guilty of the lesser offense of second-degree murder, which is sometimes called imperfect self-defense. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 148.

¶ 119 A person acting in self-defense "is justified in the use of force which is intended or likely to cause death or great bodily harm only if he [or she] reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2018). "A person who is thrust into a life-endangering situation is not required to use infallible judgment in deciding whether or how to act to defend himself [or herself]." *People v. Holman*, 2014 IL App (3d) 120905, ¶ 58. However, "[i]f the defendant responds to a confrontation with such excessive force that he [or she] is no longer acting in self-defense but in retaliation, the excessive use of force renders the defendant the aggressor, even if the other person involved actually started the confrontation." *Id.*

¶ 120 Here, defendant contends that, by finding him guilty of second-degree murder, the trial court acknowledged that defendant believed that he was acting with force necessary to prevent harm. The question, defendant maintains, is whether the trial court correctly found that his belief was unreasonable. The incident, in defendant's view, involved two larger intoxicated men (who had recently consumed cocaine) repeatedly hitting defendant, a smaller man, after threatening to "fuck him up," and defendant responding by swinging a knife to get them to back off. Whether Ignacio and Manny intended to kill him, defendant urges, is not the issue. The decisive question, he maintains, is whether defendant's belief that it was necessary to use force—and, in the case of Manny, deadly force—was reasonable under the circumstances.

¶ 121   Defendant takes issue with the fact that the trial court found Ignacio's testimony more credible than defendant's testimony, specifically, Ignacio's testimony that he and Manny never hit defendant and that Manny merely held defendant. Defendant contends that this was misguided for several reasons. Ignacio was intoxicated during the incident, with a blood alcohol level of .267, and he admitted to ingesting cocaine that evening while at the bar. His memory, according to defendant, was affected by the alcohol and/or cocaine, where Ignacio could not recall that defendant went to the bar that evening. Also, Igancio testified that he did not see Manny go inside the house and throw food out of the refrigerator, where both defendant and Theis testified to this fact. Defendant further notes that Ignacio also denied seeing Manny throw around the recycling bin and the bottles that were found in the yard and driveway, explaining that they were possibly from a barbeque the day before. However, photographic evidence showed the trash can on its side near the driveway and cans and bottles nearby, along with several cans and bottles strewn across the driveway. Defendant maintains that he and Ignacio drove their vehicles into the driveway on the night of the incident and, if the objects had been in the driveway from the prior day, they would have been broken. He also notes that Theis testified that, on the night of the incident, he heard yelling and bottles being broken on the driveway. The foregoing, according to defendant, show that either Ignacio's memory was impaired, or that he lied on the stand to minimize his brother's angry and erratic conduct. In his view, the trial court erred in relying so heavily on Ignacio's testimony.

¶ 122   Defendant also argues that Igancio's version of the stabbing made little sense. He stated that Manny merely held defendant while defendant punched Manny in the stomach for 2½ to 3 minutes. This is highly unlikely, in defendant's view, because Manny was bigger and stronger than defendant. Also, if defendant was holding his knife (as Ignacio suggested) while punching

Manny in the stomach, surely Manny would have sustained more than a single stab wound. Further, Ignacio testified that he never saw a knife in defendant's hand, making it unclear when Manny was stabbed. Defendant asserts that, given the flaws in Ignacio's testimony and his generally poor memory of the incident, the court erred in relying on his version of the events to determine whether defendant reasonably acted in self-defense.

¶ 123　Next, defendant takes issue with trial court's findings that defendant did not walk away or call for help and, instead, escalated the situation. Defendant points out that he had no duty to retreat from a place where he had a lawful right to be—the front yard and driveway of his own home. Further, defendant contends that he testified that he was backing away from the men, which was supported by the evidence showing that, when the police arrived, Manny was on the ground of the driveway near the street. Thus, even though he had no duty to retreat, his efforts to move away from the house made it more difficult for him to go into the house. Defendant also notes that he could not have gone to his car, because it was parked behind the house.

¶ 124　Defendant also takes issue with the case law upon which the trial court relied, arguing that the cases are distinguishable and do not support the trial court's findings. See, *e.g.*, *Holman*, 2014 IL App (3d) 120905, ¶¶ 7-8 (the defendant pushed his uncle down some stairs, pinned him to the ground, and pressed his thumbs into his uncle's eyes as he stood up with all of his weight); *Moore*, 343 Ill. App. 3d at 340-41 (the victim swung his arms at the defendant, but made no contact; the defendant then shot him three times in the chest); *White*, 293 Ill. App. 3d at 338 (mutual combat situation, where the defendant went to the victim's house armed with a shotgun and both men later fired shots at each other). Defendant argues that, in contrast to these cases, the facts here involved two larger individuals, intoxicated by alcohol and cocaine, fighting a smaller man, where each received a single stab wound. There was no evidence that defendant acted out of pride, and the

evidence was consistent with a person having a reasonable belief in the necessity of defending himself. This was not a mutual combat situation where the men were on equal terms, according to defendant. Both Ignacio and Manny were considerably larger than defendant and both were fighting him, making it two on one (based on defendant's testimony and what Theis initially told police). Defendant maintains that he acted with restraint, doing only what was necessary to stop the attack against him. Each man received only a single stab wound, which is not excessive in defendant's view, when he feared for his life. Finally, defendant points to the trial court's finding that defendant used cocaine, noting that there was no evidence that he consumed anything other than alcohol.

¶ 125   The State responds that defendant has failed to show that a rational factfinder could not have found that defendant did not act in self-defense. It points to defendant's testimony that, after Ignacio got between him and Manny and separated the men, defendant grabbed a steak knife to protect himself from Manny, but instead swung the knife at Ignacio, at which time Ignacio retreated and then defendant stabbed Manny by accident when Manny fell on him. This does not, the State argues, establish that defendant acted in self-defense. Rather, the evidence showed that, at the time he stabbed Ignacio, there was no imminent danger of harm, because Ignacio was unarmed. Further, Ignacio was acting as peacekeeper and had not and did not engage in physical contact with defendant prior to defendant stabbing him. The State also notes that the evidence, including defendant's testimony, showed that, when defendant stabbed Manny, Manny was holding defendant in a bear hug, but not striking or hitting him.

¶ 126   The State further contends that defendant was not a credible witness, where he gave numerous inconsistent statements to police. First, he denied involvement and later stated that he did what he had to do. The trial court's findings that Ignacio's testimony was more believable was

not erroneous, the State argues. Further, the court was not obligated to accept defendant's testimony about the incident over Ignacio's account and it properly rejected defendant's testimony regarding that chronology of the stabbings—that defendant first swung at Ignacio but did not know he had stabbed him and that Manny later fell upon the knife as he and defendant struggled.

¶ 127 Further, the State notes that the trial court acknowledged that neither defendant nor Ignacio had a perfect memory of what happened that evening. Thus, the trial court properly weighed the probability and improbability of Ignacio's testimony about how defendant stabbed him and his brother while considering that Ignacio's memory of events had been impacted by his alcohol and cocaine use. As to Ignacio's testimony that he did not see Manny throwing food out of the refrigerator and that defendant had not come to the bar prior to the incident, the State contends that Ignacio did testify that Manny threw a grill on the driveway. That Theis testified that Manny threw food and that defendant testified that Manny turned over the garbage can did not, the State maintains, contradict Ignacio's testimony that he did not personally observe Manny go inside the house or throw over the recycling bin. Further, Ignacio's testimony that defendant was not present at the bar did not necessarily show that Ignacio was unable to remember details from the evening. The State surmises that, perhaps, Ignacio did not see defendant at the bar.

¶ 128 Considering the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found that defendant was guilty of second-degree murder due to imperfect self-defense, specifically, that defendant's use of force was not necessary to avert the danger presented and the amount of force he used was excessive and unnecessary to prevent imminent harm.

¶ 129 The trial court reasonably called into doubt defendant's credibility. Defendant gave several versions of the incident. In the first version, given to Officer Garcia en route to the police station,

defendant denied involvement, stating that, after arriving home, seeing his cousins outside drinking, and going inside to use the bathroom, he thereafter exited after hearing a noise and saw his cousins on the ground.

¶ 130    The police testimony showed that defendant did not have any obvious injuries and Officer Lytle stated that defendant's clothes were cleaner and more orderly than his cousins' clothes. Defendant had only blood stains on his shirt and hands.  Ignacio had bruising on the side of his face and a swelled right eye and a cut on his left hand, and Manny had minor cuts on his right ring finger and middle finger.  At the police station, defendant told officer Cardenas and detective Grzeda that he was not involved in the incident, but added that he had gone to the bar after Manny invited him at 11 p.m.  After the three men returned to the house, defendant went to the bathroom, then came down and saw Manny and Ignacio laying on the ground.  He denied hearing any yelling and arguing.  When pressed about the blood on his shirt (Manny had not bled significantly for there to be much blood on defendant's shirt and Ignacio, according to police, bled more than Manny), defendant ultimately stated that he grabbed Ignacio and that his how he got blood on him. When asked about the steak knife, defendant explained that Ignacio had handed it to him.

¶ 131    Defendant offered the second significant version of the incident during the interview with detective Ulloa, asserting that he was involved in the incident but acted in self-defense.  Defendant added that Manny had been in the house, throwing things around, and that Manny wanted to hurt defendant, because defendant was a bad boss.  Manny, according to defendant, started a fist fight, and he and Ignacio came at defendant.  At some point, defendant grabbed the steak knife and defended himself with it.  After he stabbed Manny and perhaps stabbed Ignacio, defendant called 911.

¶ 132   In his third version of the events, given at trial, defendant related that he arrived home at 7 p.m. and saw Ignacio in the driveway, drinking. Ignacio asked about Manny, and defendant stated that he did not know where he was. Defendant let Ignacio in the house and went to shower. Afterwards, defendant came downstairs and saw Manny and Ignacio in the kitchen, drinking. Defendant left. Later that evening, defendant, in his version of the events, received a call from Manny, inviting him to join his cousins at the bar. At 11 p.m., defendant joined them and spent the next three hours there. At 2 a.m., the men left the bar. Defendant arrived home first, and, shortly thereafter, his cousins arrived. Defendant testified that, when he arrived, there were no broken bottles or litter in the driveway or surrounding area. Defendant exited his truck, tried to talk to Manny, and, "out of nowhere," Manny punched defendant in the chest and knocked him down. Defendant stated that he was perplexed as to why Manny was acting this way. Manny did not explain why he was angry, but took off his shirt and flexed his muscles. According to defendant, he repeatedly asked Manny what was going on and Manny replied that he was gong to "fuck me up." Manny came at defendant with a fist, punched him, and knocked him down. Manny continued punching, but defendant blocked most punches. Defendant claimed that he sustained facial bruising on his right side and redness on his neck.

¶ 133   At some point, defendant testified, he got Manny off of him, and Manny "got all crazy," kicking over a garbage can, knocking over a grill, and going into the house and throwing food out of the refrigerator. Manny then exited the house, and, when defendant asked why he was so mad, replied that defendant yelled at him at work. Defendant denied this. Manny came at defendant again, knocking him over, and putting defendant into a headlock. Defendant asked Ignacio for help, and Ignacio complied. Defendant got up and asked his cousins to leave, at which point Manny "got worse" and Ignacio "also turned." Defendant testified that he feared for his life, saw

a knife on another grill, and grabbed the knife. He claimed that he walked backwards on the driveway, toward North Lewis, and that Ignacio walked toward him, "trying to get me." However, he conceded at trial that Ignacio never stated that he was going to kill defendant and, contrary to what he told Ulloa, he did not see Ignacio's knife in his knife pouch. Both cousins reached defendant, held him (one by one of his arms and the other on the other side), and swung at him. Defendant stated that he tried to block the punches while holding the knife in one hand. He claimed that he repeatedly asked his cousins to back away. Defendant then swung from underneath, and Ignacio backed away. He did not know if he hit Ignacio. Manny then grabbed defendant in a bear hug. Defendant did not know if he plunged the knife into his cousin or if Manny came into the knife. When asked why he gave police different versions of the incident, defendant testified that he was scared, explaining that he used a different name and had been previously removed from the country. Thus, he could not give police his real name.

¶ 134 Ignacio's version of the incident, which the trial court generally credited, was not, as the court reasonably found, entirely the product of a perfect memory and had an obvious bias. Ignacio painted his brother in a generally positive light. Ignacio testified to his and Manny's alcohol and cocaine use that evening, stating that he was drunk and had ingested cocaine two to four times. He stated that defendant arrived at the house shortly after Ignacio and Manny arrived (after they left the bar at 2 a.m.). Defendant, in Ignacio's version, started yelling at Manny, asking what he was doing there. Manny asked him to stop yelling, because defendant yelled at him at work. Manny became angry, knocked over a grill, and walked toward the street. When Manny walked back toward defendant, they started yelling and defendant initiated the fist fight. Ignacio testified about defendant bending at the waist as he came into Manny and stated that Manny grabbed defendant and held him. (Ignacio denied that Manny hit defendant or that he hit defendant.) This

went on for about three minutes, after which Ignacio tried to pull the men apart. He felt a punch in his stomach from defendant. Ignacio stated that he did not see anything in defendant's hand.

¶ 135   Ignacio further testified that he walked to his SUV and tried to turn it on, without entering the vehicle. The vehicle did not start. Ignacio denied that defendant was at the bar and denied that Manny went into the house and started throwing things out of the refrigerator or in the house. He also stated that he did not see defendant go into the house or see a garbage can thrown over. Ignacio saw beer bottles on the grass, attributing them to a party one day earlier. Ignacio conceded that, at the hospital, he told police that Manny got mad and knocked over the grill. He also told police that he did not know when he got hit in the stomach.

¶ 136   Theis, the neighbor, corroborated defendant's testimony concerning the broken bottles, testifying that he heard yelling and breaking bottles at about 2 a.m. that evening. He also corroborated defendant's testimony that a man entered the house and threw things out of the refrigerator and out of the house.

¶ 137   The trial court found that it was unclear who started the altercation, but it did not matter. Addressing defendant's assertion that he was scared and grabbed the knife, the trial court noted that defendant did not walk away, leave, call for help, or go to his car. Instead, the court found, defendant escalated the situation by bringing "a knife to a fist fight." Based on this court's review of the photographs and video, we conclude that the trial court reasonably determined that defendant did not sustain injuries to his face, chest, or arms, which undermines defendant's statements concerning the life-threatening nature of the attack against him.

¶ 138   The court also reasonably found that there was only one knife involved in the altercation. Ignacio's testimony was consistent with the photographs of his vehicle and the blood drops on his folding knife, which was under the driver's seat. Ignacio explained that he owned a switchblade

knife (the folding knife) for use at work on irrigation systems. He left the knife in his SUV, under the driver's seat, when the brothers went to the bar, because there was a security guard at the bar. The photographs are consistent with his explanation that he went to turn on his vehicle after he was stabbed by defendant. They show drops of blood on the (back) portion of the blade that is protruding from the folded knife, along with additional drops of blood on the carpet near the knife. They also depict blood running down the driver's side seat of the vehicle. Further, forensic testing showed that the DNA profile from the knife matched Ignacio's DNA and excluded Manny's DNA profile.

¶ 139   Addressing defendant's claim that Manny had him in a bear hug shortly before Manny was stabbed, the trial court reasonably determined that Manny's actions did not constitute deadly force and that defendant's reaction—stabbing Manny to escape—was disproportionate and excessive. As the court noted, Manny had wounds on his hand that were consistent with defensive wounds, and defendant did not appear to be injured, which, again, undermined defendant's assertions concering the severity of the threat against him.

¶ 140   Although the trial court initially noted that all three men "drank around a dozen beers, ingested substances that to various degrees impaired their judgment," later, the court, specifically addressing defendant's mental process, found that he was affected "by at least the drinking; never mind the excitement of the moment." The court did not find that defendant ingested cocaine.

¶ 141   We cannot conclude that the trial court erred in crediting Ignacio's testimony over defendant's version of the events. As noted, the trial court acknowledged each man's memory lapses and biases. Further, the court noted that each man drank alcohol and that Ignacio also ingested cocaine. Defendant himself admitted to drinking 10 beers over nine hours. Defendant acknowledges that he initially denied involvement to police, but argues that this does not make

him automatically unbelievable. We agree, but the trial court viewed the witnesses during trial and made credibility assessments. Defendant fails to convince us that the trial court erred in its assessment. There were issues, as the court reasonably noted, with both main witnesses' testimony and recollection of the events. Defendant claims that Ignacio failed to recall key events that evening that renders his entire testimony suspect. He points to the fact that Ignacio did not recall defendant's presence at the bar, nor that Manny went into the house and threw food out of the refrigerator and threw the recycling bin in the driveway. Defendant argues that it is illogical, given the actors' proximity to each other, that Ignacio did not see what happened. We acknowledge that Ignacio's failure to recall these events is problematic, but we cannot conclude that they render his entire testimony incredible, especially in light of the fact that the trial court was aware of Ignacio's obvious bias not to paint Manny in a bad light. Defendant would have the issues with Ignacio's testimony render Ignacio an incredible witness, while ignoring defendant's credibility issues. We believe that the trial court reasonably assessed the witness testimony in light of the problematic issues with both of the witnesses.

¶ 142 We reject defendant's argument that Ignacio's version of the events necessarily made little sense. Defendant contends that it is unlikely that Manny merely held defendant for almost three minutes while defendant punched Manny, where Manny was bigger and stronger than defendant. He also maintains that, if defendant was holding the knife while punching Manny in the stomach, Manny would have sustained more than one stab wound. We find these points unavailing. The trial court did not accept Ignacio's entire version of the events. Further, it is certainly possible that Manny, who weighed about 50 pounds more than defendant, could have held onto defendant for a long period while defendant struggled to escape. As for the fact that defendant inflicted only one

stab wound, again, it is entirely plausible that Manny, who was stronger, fought off additional injuries.

¶ 143   We also find unavailing defendant's argument that the trial court imposed on him a duty to retreat.  The trial court's comments do not reflect as much.  Rather, the court found it notable that defendant did not walk away, etc., but "escalated the situation" and introduced a deadly weapon.  Nowhere in its findings did the court announce any duty to retreat.  It noted defendant's testimony that he was scared and, so, grabbed a knife.  The court merely contrasted this to other *options* defendant had available to him and highlighted that defendant picked an option—the knife—that escalated the situation.  This weighed against a finding that the use of deadly force was reasonable.  See *People v. Martinez*, 4 Ill. App. 3d 1072, 1076 (1972) (acknowledging that there is no duty to retreat and finding that "the ease of the defendant's escape from his assailants, the time he had to open the door of his car and take his gun from under the seat, the distance between the two automobiles, and the advantage obtained by the defendant when he possessed a loaded shotgun while his supposed assailants were unarmed, would support the conclusion that he was unreasonable in believing that he had to use such deadly force to defend himself").  Further, the fact that defendant here, as he argues, had a "lawful" right to be at his residence, does not factor greatly into the assessment of his choice of actions, because Manny, who lived at the residence, also would have had a "lawful" right to be there.  Finally, we note that the trial court would not have found defendant guilty of second-degree murder if it had determined that he had a duty to retreat.  See *Jeffries*, 164 Ill. 2d at 127-28 (to establish self-defense, the person threatened must not be the aggressor); *People v. White*, 265 Ill. App. 3d 642, 651 (1994) ("a person who is not the initial aggressor has no duty to retreat").

¶ 144    Finally, we reject defendant's argument that the trial court did not merely cite case law for general legal concepts, but also to rely on the facts in the cases to support its assessment of defendant's response to the confrontation.  For example, citing *Holman*, the trial court noted that it instructed that self-defense is not available for retaliatory acts and does not allow for excessive force.  We reject defendant's argument that the trial court compared his response to that of the *Holman* defendant.  Defendant points out that he was much smaller than Manny and Ignacio, whereas the *Holman* defendant, who acted in retaliation rather than self-defense, pushed a smaller man down the stairs, held him down and poked his eyes, after being verbally confronted about a remote control.  *Holman*, 2014 IL App (3d) 120905, ¶ 59.  There is no indication in the trial court's comments here that the court determined that there were substantial factual similarities between the cases.  Indeed, the trial court noted that the facts in *Holman* were only "somewhat pertinent."

¶ 145    In summary, the trial court did not err in finding that defendant did not act in reasonable self-defense.

¶ 146                          B. Aggravated Battery - Sentence

¶ 147    Next, defendant argues that the trial court considered an improper factor in aggravation of defendant's sentence for aggravated battery.  Specifically, he contends that the court negatively considered that defendant might illegally re-enter the United States after deportation.  For the following reasons, we reject defendant's argument.

¶ 148    The trial court's sentencing determination is entitled to great deference and will not be altered absent an abuse of discretion.  *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).  However, the question of whether a court relied on an improper factor in imposing a sentence ultimately presents a question of law to be reviewed *de novo*.  *People v. Chaney*, 379 Ill. App. 3d 524, 527 (2008).  Remand is required where the court considered an improper factor in sentencing the

defendant, and it is not possible to determine the weight the court placed on the factor in sentencing. *People v. Heider*, 231 Ill. 2d 1, 21 (2008). The defendant bears the burden of affirmatively showing that an error occurred. *People v. Burnette*, 325 Ill. App. 3d 792, 809 (2001). This requires a review of the whole record and not just a few words or statements. *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 47.

¶ 149    Defendant argues that the court imposed an excessive sentence for aggravated battery out of fear that defendant would return to the country after deportation. The trial court sentenced defendant to five years imprisonment for aggravated battery, the maximum allowable class 3 sentence. 720 ILCS 5/12-3.05(h) (West 2018); 730 ILCS 5/5-4.5-40 (West 2018).

¶ 150    In fashioning an appropriate sentence, a trial court considers numerous factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). Other relevant factors include the nature of the crime, protection of the public, deterrence, punishment, and the defendant's rehabilitative potential. *People v. Kolzow*, 301 Ill. App. 3d 1, 8 (1998). Mitigating and aggravating factors are also considered. 730 ILCS 5/5-5-3.1, 3.2 (West 2018).

¶ 151    In announcing its sentence, the trial court commented as to whether defendant would commit another crime. It stated:

> "I'll leave it to [defense counsel] and his crystal ball as to whether the federal government will prosecute you for again illegally reentering the United States. I have no idea; it's not my concern. If you owe a debt to the United States, the United States will come to you to collect it.
>
> This is the State of Illinois to whom you owe justice in the Illinois court for the crime you committed violating Illinois law, second-degree murder and aggravated battery.

But as I look to what might be your future conduct, for the last 15 plus years, every time you have been removed from the United States, you have rather quickly and quite easily come back. I imagine in the near future, if you have the possibility to do that again, you might. Again, that's more of a federal concern than mine."

¶ 152 According to defendant, despite the trial court's claim that it was "more of a federal concern than mine," the likelihood of defendant being deported and returning to the United States was still a concern of the court. The trial court, defendant asserts, never stated that it did not consider that *at all* in fashioning the sentence, and its mention of its "concern" about it shows, according to defendant, that the court gave some consideration to defendant's immigration status.

¶ 153 Defendant also argues that, despite the court's comment at the hearing on his motion to reconsider sentence that it was merely commenting on the unpredictability of federal action, the record shows otherwise. The court speculated that defendant could "rather quickly and quite easily" re-enter the country if he was deported and then gave defendant the maximum sentence. Defendant maintains that his sentence should not be determined by his status as an undocumented immigrant or whether he may be deported at the end of his prison sentence. The sentence, he urges, should be based on the factors in mitigation and aggravation and determined according to the seriousness of the offense, with the objective of restoring the offender to useful citizenship. The trial court's distrust of the ability of federal authorities to prevent defendant's re-entry, defendant argues, is not a statutory factor in aggravation and should not be considered as such. 730 ILCS 5/5-5-3.2 (West 2018). Additionally, defendant argues that the court seemingly gave him a greater sentence, because it relied on Ignacio's claim that he was stabbed after defendant had stabbed Manny. Ignacio's testimony was highly flawed, defendant urges, and he told police at the hospital that he did not know when he was stabbed.

¶ 154 Defendant maintains that there were few aggravating factors to warrant imposing the maximum sentence. Defendant had no prior crimes, pleaded guilty in 2001 to manufacture/delivery of cannabis (and sentenced to four years' imprisonment), was deported to Mexico in 2004, re-entered, was sentenced to 40 months in federal prison in 2009 for illegal re-entry, and was again deported. There is no evidence, he urges, that his return to the United States was for any criminal purpose, and he worked at a steady, well-paying job in which he oversaw a team of workers on major construction projects.

¶ 155 We find defendant's argument unavailing. Reading the court's comments in context and considering the entire record, there was no error. Prior to announcing its sentence, the court heard from defense counsel, who stated that it would be a "foolish waste of money" to send defendant to prison, because the federal government would deport him. Counsel requested that the court impose the minimum sentence for aggravated battery. In announcing its sentence, the trial court addressed defendant's history of criminal activity, noting his overstay of his visa, his drug case, his removal and re-entry into the country, and his federal imprisonment, deportation, and return. The court also noted that, in terms of deterrence, there were lessons for the community in the consequences of excessive drinking. The court also commented as to whether defendant would commit another crime, stating that it was *not* the court's concern whether he would be prosecuted if he re-entered the country. The court noted that, based on defendant's past conduct, he might again re-enter the country after deportation, but "that's more of a federal concern than mine." Given defense counsel's statement, which puts the court's comments in their proper context, we do not take the trial court's comments as reflecting that the court improperly considered that defendant could easily return to the United States. Indeed, we note that, at the hearing on defendant's motion to reconsider sentence, the trial court commented, "[i]n making the Court's

findings, the Court commented, perhaps inartfully, regarding how it assessed the evidence and the statutory and nonstatutory factors in aggravation and mitigation.  The Court commented upon an argument made *by counsel* regarding what the federal government might do.  The Court was simply attempting to comment on the unpredictability of federal action in these areas."  (Emphasis added.)

¶ 156   We add that the court found that defendant's stabbing of Ignacio was "even less justifiable" than his stabbing of Manny and "completely unwarranted and undeserved."  The incident, the court further noted, was preventable and fueled by alcohol.  The court did not reference which man was stabbed first.  We find no error with the court's sentencing determination.

¶ 157   In summary, the trial court did not consider an improper aggravating factor in determining the sentence for aggravated battery.

¶ 158                               III. CONCLUSION

¶ 159   For the reasons stated, the judgment of the circuit court of Lake County is affirmed.

¶ 160   Affirmed.